2015 OK CR 14

Shaun Michael BOSSE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. D–2012–1128.

Court of Criminal Appeals of Oklahoma.

Oct. 16, 2015.

1204

Gary Henry, Chief Capital Counsel, Mary Bruehl, Bobby Lewis, Capital Counsel, Okla. Indigent Defense System, Norman, OK, counsel for defendant at trial.

Greg Mashburn, District Attorney, Susan Caswell, Lori Puckett, Assistant District Attorneys, Office of District Attorney, Norman, OK, counsel for State at trial.

Michael D. Morehead, Appellate Defense Counsel, Jamie D. Pybas, Division Chief, Homicide Direct Appeals Div., Okla. Indigent Defense System, Norman, OK, counsel for appellant on appeal.

E. Scott Pruitt, Attorney General of Oklahoma, Thomas L. Tucker, Assistant Attorney General, Oklahoma City, OK, counsel for appellee on appeal.

### OPINION

SMITH, Presiding Judge.

¶ 1 Shaun Michael Bosse was tried by jury and convicted of Counts I, II and III, First Degree Murder in violation of 21 O.S.Supp. 2009, § 701.7(A); and Count IV, First Degree Arson in violation of 21 O.S.2001, § 1401(A), in the District Court of McClain County, Case No. CR–2010–213. For each of Counts I–III, the jury found that Bosse knowingly created a great risk of death to more than one person, that each murder was heinous, atrocious or cruel; and that each murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. In accordance with the jury's recommendation the Honorable Greg Dixon sentenced Bosse to three sentences of death (Counts I–III), and thirty-five (35) years imprisonment and a fine of $25,000.00 (Count IV), to run consecutively. Bosse appealed from these convictions and sentences and raises fifteen propositions of error in support of his appeal.

¶ 2 On July 23, 2010, Katrina Griffin, her eight-year-old son Christian and her six-year old daughter Chasity were found dead in a mobile home near Dibble, where they lived on the same rural property as her father and stepmother, Ginger. Katrina, a single mother, had a seizure disorder and received Social Security disability payments. At the time of her death, she did not drive and she did not have a job. A few months before her death, after receiving SSD payments, Katrina bought furniture, televisions and a laptop computer for the trailer. She spent a lot of time online on her laptop, and she and the children watched movies and television and played video games at home. Katrina put her initials, KRG, on many of her possessions, including video games and movies. Katrina and Bosse met online in early July 2010. Bosse visited Katrina at the trailer several times before her death and stayed overnight at least once. Bosse met Katrina's stepmother, Ginger. One weekend when the children visited their father, Bosse stayed overnight and met Katrina's cousin, Heather Molloy, and Heather's boyfriend, Henry Price. Katrina told Molloy that her relationship with Bosse was the best she'd been in.

¶ 3 On the evening of July 22, 2010, while Bosse was visiting, Katrina realized some of Christian's video games were missing. Katrina asked Ginger whether Christian had left any games there, and Ginger said he'd taken them home. Katrina talked to her mother, Rebecca Allen, several times that night, beginning at about 10:00 p.m. Katrina said Bosse was with her and the children. Katrina told Allen that she thought Price had taken the games. Katrina tried several times to call and text Molloy without success. Katrina told Allen that Bosse was driving her to Molloy's house, and one text message to Molloy said that Katrina had come over and banged on the door. Eventually Katrina called the McClain County Sheriff's Office. About 11:50 p.m., Deputy Cunningham arrived to take a missing property report. Katrina, the children, and Bosse were there.

Katrina told Cunningham that about fifteen video games were missing, and she thought they had been gone since Molloy and Price visited the previous Saturday. Sometime between 12:30 a.m. and 1:00 a.m., Katrina phoned Allen, saying the deputy had left and she was going to bed.

¶4 Ginger Griffin left for work on July 23rd at around 7:00 a.m. She looked at Katrina's trailer, but saw neither smoke nor Bosse's truck. At 8:55 a.m. a neighbor, Daryl Dobbs, drove by and saw smoke coming from the top of Katrina's trailer, near the back door. Dobbs called 911 and reported the fire, drove to the trailer, and honked his horn. He tried to open the storm door, but it was jammed, so he walked around the trailer hitting the walls and windows, without response. Dobbs looked into the windows, but could not see anything; it was pitch black. The back door was locked. Dobbs used a garden hose to spray water on the trailer roof above the back door. Later, Dobbs opened the front screen door and banged on the closed front door. There was a small hole, about the size of a golf ball, in the window to the left of the front door. Neither the front nor back doors were damaged, and there was no smoke from the doors or windows, other than a trickle from the small hole in the front window. Dobbs disconnected the trailer's propane tank and turned off the electricity.

¶5 The Dibble police chief, Walt Thompson, responded to the 911 call shortly after 9:00 a.m. He saw smoke coming from the west roof line, near the middle of the trailer. The windows were unbroken, but he could not see inside because the trailer was filled with black smoke. Thompson broke a window at the trailer's far southeast corner, leaned inside, and shouted, but nobody responded. The front door opened when it was touched, and the men on the porch were forced back by heat and heavy black smoke. Both men noticed the smoke was heavier and darker than each one had seen rising from the back of the trailer. Soon flames began to roll out the front door. By this time, they were aware that Katrina and the children might be inside. Dibble volunteer firemen Bill Scott and Mark Palmore arrived, and fought their way through the front door. In heavy smoke, they cleared the two bedrooms and bathroom on the trailer's north end, before running low on oxygen. Washington volunteer firemen Derek Cheek and Gary Bolster, in turn, entered the trailer and began to search the south side through thick black smoke. They extinguished small flames in the living room, kitchen and utility room. The master bedroom door was shut and warm to the touch. The door had a hole in it, which appeared to have been there before the fire started. When Cheek opened it, they saw the bodies of Katrina and Christian on the floor. Heat was building up, and the two had to retreat before finishing their search for Chasity. While there were no flames as they left, within fifteen minutes flames appeared. It took firefighters an hour and a half to contain the fire. They focused on suppressing the flames nearest the victims, to preserve what they could of the crime scene.

¶6 When firefighters reentered the trailer, the fire had burned significant parts of the master bedroom, including the wall to the closet. The walls in the south part of the trailer were burned, the trailer was filled with charred debris, and the floor decking was saturated with water. The bodies of Katrina and Christian were charred and covered in debris. The fire began in the love seat on the living room's west wall. The State's experts testified it could have burned for at least four hours before Dobbs saw smoke at 8:55 a.m., smoldering until the front door opened to reignite the flames.

¶7 Chasity's body, severely charred, was in the closet of the master bedroom, underneath a pile of debris. A chair had been put under the outside knob of the closet door, preventing it from being opened from the inside. Chasity was burned from the waist down—her legs were charred to the muscle and bone was exposed. She had a laceration to her right cheek and blunt force trauma on the right side of her skull. The autopsy showed soot in her stomach and lungs.

¶8 Significant blood spatter was on the walls near Christian's body. His head was partially wrapped in a blanket. He wore underwear and unbuttoned, unzipped jean

shorts. He had been stabbed five times in the neck and chest; there was a defensive stab wound on his right forearm, and he had blunt force trauma over his right eyebrow.

¶ 9 Katrina was clothed in a T-shirt, shorts and underwear; her shirt was pulled up over her torso and her hands crossed as if she had been dragged. When found after the fire, her legs were laying over Christian's, and her body was covered in debris. Her body had been partially burned, and there was some indication that it might have been covered with a sheet. She had eight stab wounds to her neck and abdomen, and blunt force trauma to the right side of her head. Her face was charred and her glasses were attached to her burned hair. She had defensive incised wounds on her right palm. Although Katrina was left-handed, her right hand held a knife with the blade pointing backwards, facing her body. Blood on this knife was consistent with Katrina's blood. A pocketknife with a broken blade was found underneath Katrina's body. The pocketknife belonged to Christian, and Katrina kept it in her bedroom.

¶ 10 The cause of death for both Katrina and Christian was multiple stab wounds. Neither victim had soot in their noses or mouths, suggesting they were dead before the fire. The cause of death for Chasity was smoke inhalation and thermal injury.

¶ 11 As investigators put out the fire and began working at the crime scene on the morning of July 23, Katrina's family members told police that she and Bosse were dating, and authorities began looking for him. Bosse shared an apartment in south Oklahoma City with his mother, Verna. Bosse left the apartment on July 22 at about 8:00 p.m. At about 6:00 a.m. on July 23, Verna saw Bosse getting ready to leave. He left between 6:15 and 6:30 a.m., went to OCCC, and logged in to a computer at about 7:30 a.m.

¶ 12 At about 2:30 p.m., McClain County Sheriff's Detective Dan Huff called and asked Bosse to come to the Sheriff's office. At about 4:00 p.m. Bosse met for about an hour with Huff and David Tompkins, and OSBI Agent Bob Horn. Officers saw Bosse had red abrasions on his knuckles. There was blood on his tennis shoes and a long scratch on his arm. Bosse admitted he was at Katrina's house the previous evening. He talked about the missing games, and said he went with Katrina and the children to Molloy's house about 10:00 p.m. Bosse said he was there when Deputy Cunningham took Katrina's report. He said Katrina wanted him to stay, but he left about 12:30 a.m. on July 23rd, reaching his apartment at 1:30 or 2:00 a.m., and was in bed by 3:00 a.m.

¶ 13 Bosse told investigators that he and Katrina had been dating a few weeks and were not serious. He admitted he spent the night with her a week earlier when the children were gone. He said he'd spent some time there and had been in every room of the trailer. Bosse said Katrina texted him that morning, but he could not retrieve it from his phone. Justine Lyman dated Bosse from early July 2010, until Bosse changed his Facebook status to "in a relationship" with Katrina. At midnight on July 23, Lyman sent Bosse a Facebook message complaining about Katrina. Bosse responded at 7:44 a.m., saying Katrina was a crazy bitch, nothing was going on, and he was dropping Katrina from his friends list. He told Lyman she could check with Katrina to confirm this. Bosse communicated with Lyman and a woman named Sarah by text throughout that day.

¶ 14 Investigators asked to search Bosse's truck. He refused, but let them take photographs of its contents. A laptop with cables, a Bic lighter and DVD case marked "KRG" were in the front floorboards. A PlayStation console, video games, and DVD cases marked "KRG" were in the front and back seat areas. Bosse said the laptop belonged to a friend, but would not give a name. Bosse left the Sheriff's office after 5:00 p.m. Later that day, Ginger identified the laptop, and other items in the photos, as Katrina's. OSBI Agent Akers went to Bosse's apartment on the night of July 23 and asked again to search his truck, and this time Bosse agreed. Akers also noticed Bosse's red knuckles, the scratch and the blood on his shoes. Bosse told Akers he'd been to several places that day, including OCCC and a Walmart, but did not say he went anywhere north of I–240 in

Oklahoma City, or mention any pawnshops. Bosse's brother, Matthew, was also at the apartment. Matthew was 6 foot 2 or 3 inches and about 300 pounds, while Bosse was about 5 foot 8 or 9, and about 210 pounds, and the two could not have shared clothing. When Akers searched Bosse's truck, most of the property photographed earlier was gone, though the movies were found in Bosse's bedroom. Investigators searched Bosse's apartment and found items from Katrina's trailer. Stains which might have been blood were on towels and the laundry basket, but only one towel was presumptively tested for blood, and that was not confirmed. A pair of bloody jeans was found in the back of Bosse's closet. DNA tests on the jeans showed genetic profiles from Chasity and Bosse. DNA tests of blood on Bosse's shoes were consistent with Chasity (right shoe) and Katrina (left shoe).

¶ 15 Bosse's billfold was in his truck. A rip in the back created a hidden pocket, which held pawn tickets. When Akers asked Bosse if he forgot to mention the pawn tickets, Bosse turned white, and Akers arrested him. Bosse had pawned more than one hundred of Katrina's possessions at seven different Oklahoma City pawnshops the morning of July 23, when the trailer was still burning. The pawned items included televisions, a game console and VCR or DVD player, as well as several dozen movies and video games. Most of the games and DVDs were marked with the initials "KRG", and sales receipts confirmed that the electronic equipment was Katrina's. Bosse's and Katrina's fingerprints were found on some of the pawned items. A TV remote in Bosse's truck matched one of Katrina's TVs that Bosse pawned. Officers were able to connect the items to Katrina by serial numbers, Katrina's initials, and identification through witnesses.

## Pretrial Issues

### Admission of scientific evidence

¶ 16 Bosse claims in Proposition I that the evidence produced at the *Daubert* hearing was not sufficiently reliable or relevant and should not have been admitted, and argues that admission of this evidence violated his constitutional right to due process. The State alleged that Bosse set the trailer on fire after he killed Katrina and Christian and barricaded Chasity in the closet. Bosse was at home in Oklahoma City, an hour away from the trailer, at 6 a.m. Ginger Griffin did not notice any smoke at 7:00 a.m., but Dobbs saw smoke at 8:55 a.m. For Bosse to have set the fire, it had to smolder for approximately four hours before Dobbs saw the smoke. Billy Magalassi, an arson investigator with the Tulsa office of the Federal Bureau of Alcohol, Tobacco, and Firearms (BATF), determined that the fire began on a love seat next to the west wall of the trailer. Magalassi concluded that the fire was slow-burning. He determined it flamed for a few minutes, then smoldered in the limited oxygen in the trailer. Magalassi thought the fire could have smoldered a minimum of two hours, and as long as six or seven hours, before Dobbs and Thompson, breaking in, introduced more oxygen and flames flared up. Based on his investigation, he concluded that the fire was incendiary, meaning it was intentionally set.

¶ 17 Magalassi wanted a second opinion, and called in Jamie Lord, a fire research engineer for the BATF Fire Research Laboratory in Ammendale, Maryland. Lord consults with BATF investigators nationwide. Lord was asked to determine (1) whether the origin of the fire on a love seat against the living room west wall was consistent with the damage to the mobile home, and whether it was possible that the fire burned for as long as four hours before a neighbor saw it; and (2) what was the likely time, in such a fire, before a young child located in the master bedroom closet would become incapacitated from the smoke and toxic products of the fire. Lord visited the crime scene on August 3. He later conducted several tests at his Ammendale laboratory, and testified as an expert for the State. Lord agreed with Magalassi that the fire started in the love seat and was incendiary in nature.

¶ 18 The trial court held a pretrial *Daubert* hearing on Lord's experiments and

found them admissible.[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993); *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999). Bosse claims this was error. We review a trial court's decision to admit or deny novel scientific evidence *de novo. Taylor v. State,* 1995 OK CR 10, ¶ 23, 889 P.2d 319, 332.

An expert may testify to an expert opinion which is (1) based on sufficient facts or data; (2) the product of reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case. 12 O.S.2011, § 2702. Taken together, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999), govern admissibility of scientific and other technical or specialized evidence. We adopted *Daubert* in *Taylor v. State,* 1995 OK CR 10, 889 P.2d 319, holding that "trial judges must continue to act as gatekeepers, ensuring that all *novel* scientific evidence is both reliable and relevant." 1995 OK CR 10, ¶ 17, 889 P.2d at 329 (emphasis added). In determining whether novel scientific evidence is admissible, a trial court should consider (a) whether the scientific method has been or can be tested; (b) whether the theory or technique has been subjected to peer review and publication; (c) the technique's known or potential rate of error; and (d) whether the theory has gained general acceptance in the relevant scientific community; in addition, the testimony must have a valid scientific connection to the pertinent inquiry such that it assists the trier of fact. *Taylor,* 1995 OK CR 10, ¶¶ 18–20, 889 P.2d at 330. Citing *Daubert,* we noted that the *Daubert* analysis is flexible, designed to accommodate many factors without setting forth a definitive checklist or test. *Taylor,* 1995 OK CR 10, ¶ 21, 889 P.2d at 330.

*Day v. State,* 2013 OK CR 8, ¶ 4, 303 P.3d 291, 294, *r'hng denied* 2013 OK CR 15, 316 P.3d 931. Under *Daubert's* second prong, the testimony must be relevant, assist the trier of fact to understand the evidence or determine a fact in issue, by bearing a valid scientific connection to the pertinent inquiry. *Daubert,* 509 U.S. at 591–92, 113 S.Ct. at 2795–96. Bosse does not attack the reliability requirement, and the record shows that requirement was met. Bosse claims that the second prong was not met because Lord's evidence was not relevant.

¶ 19 Lord viewed the scene, taking photographs and measurements, and reviewed the Medical Examiner's reports and crime scene photographs. He bought a mobile home of the same make and year as Katrina's, disassembled it, and shipped it to Ammendale. Lord used materials from the trailer to make five experimental replications of the relevant inside and outside parts of the Griffin trailer, using his measurements of the crime scene. He used parts of the metal siding, studs, interior wood paneling, insulation and trim, ceiling insulation, and heat and air system with ductwork. Lord bought five love seats like Katrina's. The primary parameters of the tests, based on conditions at the crime scene, were that the doors were closed, and the windows were intact (though there was a small hole in the front window near the door). Instruments measured the temperature, oxygen and carbon monoxide levels, and amount of energy felt in different parts of the structure during each experimental fire. Based on the results recorded by the measuring equipment, Lord estimated Chasity would likely have been incapacitated in sixteen to fifty minutes after the fire began.

¶ 20 Lord conducted five burns. The first three tests were not representative of the actual trailer fire. For the first test, glass windows were installed. One quickly broke and let in air. The fire grew quickly and was burning within eight to ten minutes, and there was no time for carbon monoxide buildup in the closet area. Lord removed the windows, replacing them with caulked drywall. The issue was how much air was available to the fire, so rather than continuing to replace windows in subsequent tests, Lord replicated the sealed-window conditions of

[1]. The trial court subsequently admitted the evidence at trial over Bosse's objection.

the actual fire. During the second test, the fire burned up through the plywood roof, let ·in air, and allowed flames to break out earlier than they did in the original trailer fire. The roof in the original trailer was noncombustible and did not burn through. After that test, Lord installed a noncombustible cement board roof. During the third test, the fire burned through the floor and developed underneath the trailer. The original trailer had a tight trailer skirting which limited air flow underneath the trailer, and consequently fire had not taken hold under the trailer in the original fire. The experimental trailers in the first three tests had no trailer skirting. After the third test Lord installed a tight trailer skirting.

¶ 21 The fourth and fifth tests more closely replicated the conditions of the actual fire. The experimental trailer for the fourth test had windows sealed with drywall, a noncombustible roof, and a tight trailer skirting. During the fourth test the fire burned slowly for four hours, until the door was opened, air entered, and flames grew quickly. During the fifth test, the glass windows were reinstalled. No windows broke, but the front window developed a small hole similar to that observed in the original trailer fire. The fire apparently ran out of oxygen or fuel and went out after about two hours.

¶ 22 The experiments had some differences from the original fire.[2] Lord did not add all the furniture in the trailer, including only that which he thought would have been involved in early stages of fire. · Lord used fire caulk to seal the drywall in the windows. The noncombustible roof installed for the third experiment was fiberglass-reinforced cement board, not rolled metal like the roof of the original trailer, and probably reflected more heat. Lord determined that the fire's strength was influenced by the level of oxygen in the trailer; during the initial growth phase, the fire consumed most of the oxygen and the fire died down until revived by more oxygen. Lord concluded the fourth burn experiment was most similar to the actual fire conditions.

¶ 23 Bosse argues this testimony was not relevant because tests did not simulate the actual conditions of the fire and had no valid scientific connection to the issue at trial. On the contrary, we find the testimony was relevant because there was a genuine issue of fact regarding whether Bosse could have set the fire. This Court has held that experiments to prove that specific acts or operations present in the case led to an alleged result should be made under similar conditions and circumstances, and their admission is within the trial court's discretion. *Irby v. State*, 18 Okla.Crim. 671, 197 P. 526, 530 (1920); *see also Gibbons v. Terr.*, 5 Okl. Cr. 212, 115 P. 129, 137–38 (1911). An abuse of discretion is any unreasonable or arbitrary action made without proper consideration of the relevant facts and law, also described as a clearly erroneous conclusion and judgment, clearly against the logic and effect of the facts. *Neloms v. State*, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170. The question is whether the experiment is sufficiently similar to help ·jurors understand the issue, or whether the circumstances are so different that the evidence will confuse the jury. *Andrews v. State*, 1976 OK CR 258, ¶ 14, 555 P.2d 1079, 1083–84. Bosse suggests that his case should be controlled by the result in *Andrews*, where the Court excluded the defense expert testimony because his ballistics experiments used a gun with a different barrel length than the gun used in the crime. However, the factual analysis for each case is necessarily different. The real question is whether, under the circumstances of this case, the trial court abused its discretion in admitting the evidence. *Id.* Bosse also relies on several nonbinding civil cases involving automobiles: *Navajo Freight Lines v. Mahaffy*, 174 F.2d 305, 309–10 (10th Cir.1949) (no abuse of discretion in refusing to admit an experiment which both failed to replicate existing conditions of the accident, and was irrelevant to the issue); *Jackson v. Fletcher*, 647 F.2d 1020, 1026–27 (10th Cir.1981) (abuse of discretion to admit experiment results

2. Bosse claims the test was dissimilar because the paper backing was removed from the insulation. Lord testified that this occurred because the paper backing had been removed from the insulation in the original trailer. Magalassi also testified that he saw no paper backing on the remaining insulation at Katrina's trailer.

where experiment conditions differed from accident conditions); *Jones v. Stemco Mfg. Co.,* 1981 OK 10, ¶¶ 14–15, 624 P.2d 1044, 1047 (abuse of discretion to admit experiment conducted on significantly different vehicle in dissimilar conditions); *Guild v. General Motors Corp.,* 53 F.Supp.2d 363, 366 (W.D.New York 1999). The State cites cases from other jurisdictions holding there is no abuse of discretion in admitting experiments where conditions are so substantially similar as to provide a fair comparison, though the original conditions are not precisely reproduced. *United States v. Norris,* 217 F.3d 262, 270–71 (5th Cir.2000); *Rankin v. Commonwealth,* 327 S.W.3d 492, 498–99 (Ky.2010). The only important thread throughout these otherwise irrelevant cases is that the determination whether experiment evidence is sufficiently similar to the original conditions, and its admission, is within the trial court's discretion.

¶ 24 Bosse argues that the experiment conditions were too dissimilar to be relevant. He points specifically to the substitution of drywall for windows in several of the tests. Lord testified at the *Daubert* hearing that there were many unpredictable variables involved in whether windows will fail during a fire, including the framing and installation, and properties of the glass. Lord testified that the drywall and the closed windows had similar ventilation properties, with a similar effect on the oxygen level in the house. Bosse tries to reframe the issue, asking whether a fire could burn in the trailer for four hours without breaking any windows, and complains that Lord's experiments did not answer that question. Bosse argues that Lord merely tried to prove the State's theory. On the contrary, jurors heard evidence that Lord tried several experiments, using both windows and drywall. The record shows that, over the course of several tests, Lord sufficiently replicated the conditions of the original fire to simulate the actual conditions. The differences between the experiment conditions and the original fire go to the weight of the evidence, not its admissibility, were thoroughly discussed in cross-exam-

ination, and were disputed by the defense expert. *Irby,* 197 P. at 531; *Rankin,* 327 S.W.3d at 499. The record supports the trial court's conclusion that the evidence was reliable and relevant, and the trial court did not err in admitting it. *Taylor,* 1995 OK CR 10, ¶ 23, 889 P.2d at 332. This proposition is denied.

### Exercise of the Fourth Amendment right to refuse consent to search

¶ 25 In Proposition II, Bosse argues that the prosecution's substantive use of his exercise of his Fourth Amendment right to refuse to consent to a warrantless search of his vehicle raised an impermissible inference as to his guilt, depriving him of due process of law and a fair trial and reliable sentencing hearing under the Fourth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9, 20 and 30 of the Oklahoma Constitution. Bosse voluntarily talked to police on the afternoon of July 23. Investigators asked to search Bosse's truck. He refused, but let them take photographs of its contents. A laptop with cables, a Bic lighter and DVD case marked "KRG" were in the front floorboards. A PlayStation console, video games, and DVD cases marked "KRG" were in the front and back seats. Bosse said the laptop belonged to a friend, but would not give a name. Ginger Griffin identified the laptop, and other items in the photos, as Katrina's. OSBI Agent Akers went to Bosse's apartment on the night of July 23 and asked again to search his truck, and this time Bosse consented. At trial, Bosse's conversation with police was admitted, along with the photographs of the truck's contents and the results of the later consent search. Bosse does not complain about admission of any of this evidence.

¶ 26 Over Bosse's vigorous and continued objection, the trial court allowed two witnesses to testify that Bosse initially refused to let officers search his truck. Prosecutors admitted Bosse had a right to refuse consent, but argued that they could comment on that refusal because he was hiding evidence.[3]

---

**3.** In opening statement the prosecutor told jurors Bosse refused consent to search his truck. Bosse did not object to this statement.

Prosecutors vigorously argued in closing that this refusal was substantive evidence of Bosse's guilt. Bosse claims admission of this evidence for this purpose, and its use in closing argument, was error. Bosse did not object to the remarks in argument, waiving all but plain error for those claims.

¶ 27 The Fourth Amendment guarantees the right to be free from unreasonable search and seizure. U.S. Const.Amend. 14. Any citizen has the right to refuse consent to search his property, and to require the government to get a warrant before conducting a search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). There is no binding law on whether a prosecutor violates a defendant's constitutional right by using a defendant's refusal to consent to a warrantless search as substantive evidence of guilt. This Court has not previously decided this issue. However, we have found that prosecutors erred in arguing as substantive evidence of guilt the defendant's exercise of constitutional rights, including refusing to give a written statement to police and consulting attorneys when one is under investigation for a crime. *Brewer v. State,* 2006 OK CR 16, ¶¶ 10–11, 133 P.3d 892, 894–95.

¶ 28 Admission of evidence is within the trial court's discretion. *Neloms,* 2012 OK CR 7, ¶ 25, 274 P.3d at 167. Bosse argues that the trial court abused its discretion in admitting this evidence and the subsequent argument concerning it. *Bosse* argues that a person should not suffer penalty for exercising a constitutional privilege. He relies on *Perry v. Sindermann,* in which the United States Supreme Court held that a non-tenured professor could not be denied re-employment based on his exercise of his right to free speech under the First and Fourteenth Amendments. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In *Perry,* the Court concluded that Sindermann's lack of a contract or tenure did not defeat his constitutional claims, because the government may not deny a person a benefit as a consequence of exercise of a constitutionally protected right. *Perry,* 408 U.S. at 598, 92 S.Ct. at 2698. In another context, the Supreme

Court discussed the Fourth Amendment right to refuse consent to search. *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). In finding that administrative health and safety inspections require a warrant, the Court noted that refusing entry to authorities for inspections often carried criminal penalties. *Camara,* 387 U.S. at 532–33, 87 S.Ct. at 1732–33. The Court concluded that Camara could not be constitutionally prosecuted for exercising his Fourth Amendment right to refuse to consent to an inspection without a warrant. *Camara,* 387 U.S. at 540, 87 S.Ct. at 1736–37. Discussing when an encounter with police constitutes a seizure under the Fourth Amendment, the Court noted that a person may refuse an officer's requests without fear of prosecution. *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991).

¶ 29 Bosse draws an analogy to Fifth Amendment claims. It is settled that prosecutors cannot comment on a defendant's exercise of the Fifth Amendment privilege against self-incrimination, using it as substantive evidence of guilt. *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965). However, Bosse is not making a Fifth Amendment claim here. Rather, he suggests that the principle in *Griffin* should apply equally in the Fourth Amendment context. Every jurisdiction which has published a case on this issue has either concluded or implied that *Griffin* should be so extended. The State fails to provide any persuasive or binding case law in which a court has reached an opposite conclusion.

¶ 30 Several federal circuit courts have considered this issue and concluded that exercise of the Fourth Amendment right to refuse consent to search is not admissible as substantive evidence of guilt. The Sixth Circuit has stated, "The exercise of a constitutional right, whether to refuse to consent to a search, to refuse to waive *Miranda* rights or to decline to testify at trial, is not evidence of guilt." *United States v. Clariot,* 655 F.3d 550, 555 (6th Cir.2011). The Third Circuit explicitly extended the reasoning of *Griffin* to the Fourth Amendment context, finding

"little, if any, valid distinction between the privilege against self-incrimination and the privilege against unreasonable searches and seizures which is relevant to the propriety of the prosecutor's argument." *United States v. Thame,* 846 F.2d 200, 206 (3rd Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988). The Third Circuit went on to note that to find otherwise would undermine the law prohibiting use of a defendant's testimony at a suppression hearing against him at trial, finding that the "protection would be largely illusory" if the defendant's reliance on the Fourth Amendment, proved by evidence other than his testimony, could be used against him at trial. *Thame,* 846 F.2d at 207. The Third Circuit cited with approval a Ninth Circuit case, *Prescott,* in which the Ninth Circuit extended the reasoning of *Griffin* to the Fourth Amendment and, relying on *Camara, supra,* asserted that the Fourth Amendment right at issue could be neither a crime itself nor evidence of a crime. *United States v. Prescott,* 581 F.2d 1343, 1350–51 (9th Cir.1978). The Ninth Circuit held that a defendant can refuse consent to search, with the purpose of concealing wrongdoing, and that this refusal cannot be used against him in a criminal prosecution. *Prescott,* 581 F.2d at 1351–52. *Prescott* noted that both the innocent and the guilty have the right to refuse consent to search, just as they do to remain silent, but that the prosecutor's objective in introducing a defendant's refusal of consent is to infer guilt; the Court found this just as impermissible as using a defendant's silence to infer guilt. *Prescott,* 581 F.2d at 1352.

¶ 31 The United States District Court for the Eastern District of Virginia explained the reasoning behind the prohibition against use of a defendant's refusal to consent to a search as substantive evidence of guilt:

If the Government was allowed to admit a suspect's refusal of consent in order to show consciousness of guilt, a defendant's consent could never be truly voluntary. In such an instance, the defendant would be faced with a "Hobson's choice." He could either consent to a search of his vehicle and relieve the Government from getting a warrant, a key procedural safeguard against unreasonable searches, or he could

assert his constitutional right by refusing to grant consent, and have that refusal incriminate him by implication. Admitting such a statement would punish a person for asserting a constitutional right.

*United States v. Guess,* 756 F.Supp.2d 730, 747–48 (U.S.D.C.E.D.Va.2010).

¶ 32 Other federal circuits have discussed the issue. The Tenth Circuit has held that evidence the defendant refused consent to search was admissible as evidence of dominion and control, but noted that, if the evidence were not admitted in response to a defense claim or for another proper purpose, its admission would be error. *United States v. Dozal,* 173 F.3d 787, 794 (10th Cir.1999). The Tenth Circuit has also stated that, when determining reasonable suspicion for an investigative detention, "it should go without saying" that consideration of a defendant's refusal to consent to a search violates the Fourth Amendment. *United States v. Wood,* 106 F.3d 942, 946 (10th Cir.1997). While not addressing the issue directly, the Fifth and Seventh Circuits relied on cases from other jurisdictions (discussed *infra* ), assuming without deciding that such evidence would be constitutional error, before finding the error in each case was harmless beyond a reasonable doubt. *United States v. Runyan,* 290 F.3d 223, 249–50 (5th Cir.2002); *United States v. Moreno,* 233 F.3d 937, 940–41 (7th Cir.2000). *Runyan* particularly noted that the circuit courts directly addressing the issue had unanimously held a defendant's refusal to consent to a warrantless search may not be used as evidence of guilt. *Runyan,* 290 F.3d at 249.

¶ 33 Several state courts have held that refusal of consent to search under the Fourth Amendment cannot be used as substantive evidence of guilt or to show consciousness of guilt. The Colorado Court of Appeals recently engaged in a thorough discussion of this issue, summarizing the various jurisdictions' approaches described herein. That court noted that refusal of consent to search might, as in *Dozal, supra,* be admissible for some proper purpose, but determined that it was always improper to admit such evidence to infer or show guilt or consciousness of

guilt. *People v. Pollard,* 307 P.3d 1124, 1130–31 (Colo.Ct.App.2013).

¶ 34 Early discussions of this issue are found in cases from Alaska, California, and New Mexico. In *Padgett v. State,* the Alaska Supreme Court stated, "Padgett had a right under the Fourth Amendment to the Federal Constitution, and article I, section 14 of the state constitution, to refuse to consent to a search of all or part of his car. That right would be effectively destroyed if, when exercised, it could be used as evidence of guilt. It was error to admit testimony of defendant's refusal, and error to comment on it during summation." *Padgett v. State,* 590 P.2d 432, 434 (Alaska 1979). The Supreme Court of New Mexico, noting that a defendant "has a right to refuse to consent to a warrantless search without such refusal later being used to implicate his guilt", found that the defendant did not testify, and his refusal to consent "could not be mentioned unless he testified to the contrary on direct examination." *Garcia v. State,* 103 N.M. 713, 714, 712 P.2d 1375, 1376 (1986). *See also Gomez v. State,* 572 So.2d 952, 953 (Fla.Dist.Ct.App. 1990) ("A defendant who has a constitutional right to refuse to consent to a search … should be free to exercise that right with impunity. No comment on its exercise should be permitted to raise an inference of guilt, if the Fourth Amendment right against unreasonable search and seizure is to be given its full meaning."); *People v. Keener,* 148 Cal.App.3d 73, 78–79, 195 Cal.Rptr. 733, 736 (Cal.App.1983) (defendant refused to consent to warrantless entry into his apartment; assertion of this right is neither itself a crime nor evidence of a crime).

¶ 35 Other states have reached the same conclusion. The Georgia Court of Appeals held that a defendant's refusal to consent to search may not be used against him as evidence of guilty knowledge. *Mackey v. State,* 234 Ga.App. 554, 507 S.E.2d 482, 483–84 (1998). The Idaho Supreme Court applied *Griffin's* reasoning to a defendant's exercise of the Fourth Amendment right to refuse consent to search, finding that a prosecutor cannot use the exercise of that right to show consciousness of guilt; in that case, the error was harmless beyond a reasonable doubt.

*State v. Christiansen,* 144 Idaho 463, 163 P.3d 1175, 1182–83 (2007). *See also State v. Wright,* 153 Idaho 478, 283 P.3d 795, 806 (App.2012) ("[E]liciting testimony from a witness regarding a defendant's refusal to consent to a search, when used for the purpose of inferring guilt, is prosecutorial misconduct and may be fundamental error.") The Maryland Court of Appeals found that exercise of the constitutional right to refuse consent to search of a car may not be used to imply guilt, as that would place an "unfair and impermissible burden" on the assertion of the right. *Longshore v. State,* 399 Md. 486, 924 A.2d 1129, 1158–59 (2007). In that case, the trial court had sustained the defendant's objection to evidence that he had refused consent to search his car, and admonished the jury to disregard that evidence, but refused his request for a mistrial. The Court held that the trial court erred in denying the request for mistrial, and the curative instruction did not protect the defendant's right to a fair trial. *Id.* at 1159. The Kentucky Supreme Court concluded that a defendant's refusal to consent to fingerprint sampling was properly admitted to rebut and impeach his claim of self-defense, but noted, "Generally, such as in *Deno,* exercising one's privilege to be free of warrantless searches is simply not probative (or has low probative value) to a determination of guilt, and thus, the defendant's right to not be penalized for exercising such a privilege is paramount." *Coulthard v. Commonwealth.,* 230 S.W.3d 572, 584 (Ky. 2007). *See also Deno v. Commonwealth.,* 177 S.W.3d 753, 761–62 (Ky.2005) (A defendant has the Fourth Amendment right to refuse to submit biological specimens; refusal to consent to search is privileged conduct and cannot be considered as evidence of guilt).

¶ 36 Where a defendant refused to consent to a warrantless DNA sample, the Wisconsin Supreme Court noted the weight of state and federal authority prohibited using the exercise of the Fourth Amendment right to consent to search as evidence of guilt, holding that comment on the exercise of that right violates due process. *State v. Banks,* 2010 WI App 107, ¶¶ 21–25, 328 Wis.2d 766, 790 N.W.2d 526, 533–34. The Nevada Supreme Court, noting that many courts had already held the State may not infer guilt from a

defendant's exercise of his Fourth Amendment right to refuse consent to search, adopted that rule; the court emphasized that a defendant should not be punished for asserting a constitutional right, but found erroneous admission of the evidence harmless beyond a reasonable doubt. *Sampson v. State,* 121 Nev. 820, 122 P.3d 1255, 1260–61 (2005). The Court of Appeals of Texas followed the Ninth Circuit's reasoning in *Prescott,* and concluded that the prosecutor could not infer guilt from exercise of the right to refuse consent to search, and the error was of constitutional magnitude; the error in admitting the evidence was harmless beyond a reasonable doubt. *Reeves v. State,* 969 S.W.2d 471, 495–96, (Tex.Ct.App.1998). The Michigan Court of Appeals determined that assertion of the right to refuse consent to search of a car cannot be a crime or evidence of a crime, finding, "It would make meaningless the constitutional protection against unreasonable searches and seizures if the exercise of that right was allowed to become a badge of guilt." *People v. Stephens,* 133 Mich.App. 294, 349 N.W.2d 162, 163–64 (2010) (*quoting Bargas v. State,* 489 P.2d 130, 132 (Alaska 1971)). The Arizona Court of Appeals found that using a defendant's refusal of consent to search as substantive evidence of guilt would appreciably impair the Fourth Amendment's prohibition of unreasonable searches, by penalizing defendants for exercising that right; erroneous admission of the evidence was not prejudicial in that case. *State v. Stevens,* 228 Ariz. 411, 267 P.3d 1203, 1208–09 (App.2012); *see also State v. Wilson,* 185 Ariz. 254, 914 P.2d 1346, 1350–51 (App.1995) (trial court erred in admitting defendant's refusal of consent to show defendant was uncooperative; generally cannot show guilt through exercise of the Fourth Amendment right to refuse consent, and the valid exercise of a constitutional right, standing alone, does not show defendant is uncooperative.)

¶ 37 Although Bosse cites many of the cases discussed above, the State wholly fails to address them. The State first argues that the record here supports neither a search nor a seizure—although Bosse does not claim that there was any improper search or seizure. The State then argues that Bosse has no claim under the Fifth Amendment—although Bosse does not raise a Fifth Amendment claim. Finally, the State turns to Bosse's claim that the reasoning of *Griffin* should be applied to the Fourth Amendment right to refuse consent to a search. The State does not discuss what appears to be the settled law from twenty-one separate state and federal jurisdictions, applying the *Griffin* reasoning in this precise way. Instead, writing as if none of those cases exist, the State argues that a recent United States Supreme Court case limits *Griffin* in the Fifth Amendment context. In *Salinas v. Texas,* a divided Supreme Court in a plurality opinion held that, during noncustodial police questioning where no *Miranda* warnings are given, a defendant must expressly invoke his Fifth Amendment privilege against self-incrimination. *Salinas v. Texas,* —— U.S. ——, 133 S.Ct. 2174, 2179–80, 186 L.Ed.2d 376 (2013). The plurality found that Salinas' interview was noncustodial and voluntary, his statements were outside the scope of *Miranda,* not coerced, and he was free to voluntarily and explicitly state that he refused to answer questions on Fifth Amendment grounds, but failed to do so. *Salinas,* 133 S.Ct. at 2180–81.

¶ 38 *Salinas* has very little relevance to the issue before this Court, but what relevance it has appears to support Bosse's claim. *Salinas* focuses exclusively on when, whether, and how a defendant must claim his Fifth Amendment right to silence during noncustodial questioning. As, during the course of a noncustodial interview, Bosse did not exercise his Fifth Amendment right, this discussion in *Salinas* is simply irrelevant. However, Bosse did, explicitly and in writing, exercise his Fourth Amendment right to refuse consent to search—the precise thing the *Salinas* plurality would have required of the defendant in that case in order to preserve his Fifth Amendment right under *Griffin* and *Garner.* Nothing in either the plurality opinion or the dissent suggest that a majority of the Court considered in any way the issue before this Court. Two Justices, concurring in the judgment, clearly state that they disagree with *Griffin* and would allow a prosecutor to infer guilt from a defendant's failure

to testify, or from his silence during questioning. *Salinas,* 133 S.Ct. at 2184 (Thomas, J., concurring in the judgment)(joined by Justice Scalia). Logically extended to the Fourth Amendment issue, this would suggest these two Justices would also overturn the weight of law discussed above in the Fourth Amendment context. However, there is no indication that the remaining Justices would agree. Essentially, the State asks this Court to speculate, based on a plurality opinion interpreting the Fifth Amendment and relying primarily on a separate writing joined by only two Justices, that the Supreme Court would overturn the settled Fourth Amendment law discussed above—and, relying on that speculation, to reject Bosse's claim.

 ¶ 39 This Court finds the weight of the law discussed above persuasive, but we note that this issue is subject to harmless error analysis. Most constitutional errors occurring during trial are subject to harmless error analysis, as they may be assessed, along with the evidence presented, for any prejudice to the defendant. *Robinson v. State,* 2011 OK CR 15, ¶ 3, 255 P.3d 425, 428; *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). For purposes of this case, we assume without deciding that a defendant's exercise of his Fourth Amendment right to refuse consent to search may not be used as substantive evidence of guilt. Because the error is of constitutional dimensions, we review both admission of the evidence and its use in closing argument to determine whether the error was harmless beyond a reasonable doubt. *Robinson,* 2011 OK CR 15, ¶ 12, 255 P.3d at 430; *Bartell v. State,* 1994 OK CR 59, ¶ 10, 881 P.2d 92, 95. Bosse does not contest admission of his own statements, or any of the incriminating evidence obtained either with his consent or with a warrant; in addition, the State presented forensic evidence and testimony supporting the verdict. Under the circumstances of this case we find any error in use of this evidence to infer guilt was harmless beyond a reasonable doubt. *Miller v. State,* 2013 OK CR 11, ¶ 106, 313 P.3d 934, 971–72; *Robinson,* 2011 OK CR 15, ¶ 3, 255 P.3d at 428. This proposition is denied.

## Guilt Stage Claims

### Admission of Visual Aids to Testimony

¶ 40 Bosse argues in Proposition IV that the erroneous admission of hearsay evidence deprived him of a fair trial and reliable sentencing. Antje Stambaugh, an OSBI DNA analyst, testified regarding her analysis of DNA samples from Bosse and all three victims. Stambaugh prepared two tables illustrating the genetic profiles from the four subjects and the items of evidence she tested. These were admitted, over Bosse's objection that they were cumulative, as State's Exhibits 304 and 305. Bosse argues this decision was error because the exhibits were inadmissible hearsay. Admission of evidence is within the trial court's discretion. *Neloms,* 2012 OK CR 7, ¶ 25, 274 P.3d at 167. Because Bosse did not object to these exhibits on these grounds at trial, he has waived all but plain error. *Brown v. State,* 2008 OK CR 3, ¶ 11, 177 P.3d 577, 580. Bosse fails to show any actual error, that is plain or obvious, and that affected a defendant's substantial rights, affecting the outcome of the trial. *Barnard v. State,* 2012 OK CR 15, ¶ 13, 290 P.3d 759, 764.

 ¶ 41 Bosse characterizes these exhibits as "investigative reports by police and other law enforcement personnel," which are inadmissible under 12 O.S.2011, § 2803(8)(a); *see, e.g., Salazar v. State,* 1998 OK CR 70, ¶ 22, 973 P.2d 315, 324 (motor vehicle theft report); *Humphreys v. State,* 1997 OK CR 59, ¶ 25, 947 P.2d 565, 574–75 (DOC investigative reports); *Frazier v. State,* 1994 OK CR 31, ¶ 12, 874 P.2d 1289, 1292 (prison pen pack); *but see Charm v. State,* 1996 OK CR 40, ¶ 28, 924 P.2d 754, 764 (routine DOC records were not investigative reports). The record does not support this characterization of these documents. The tables consisted of numbers—information—from Stambaugh's tests, without any results or conclusions. Without her testimony, they are meaningless. They are simply not investigative reports.

 ¶ 42 Bosse also seems to suggest that State's Exhibits 304 and 305 were summaries of Stambaugh's testimony, and that their admission was improper because it put

too much emphasis on her testimony. Bosse relies on *Moore v. State*, in which we held that it was not error to give jurors a summary of an expert's findings, noting that the summaries were not admitted into evidence. *Moore v. State*, 1990 OK CR 5, ¶ 44, 788 P.2d 387, 398. He mistakenly suggests that admission of these exhibits is like the admission, and use in deliberations, of videotaped testimony and a transcript of a recorded exhibit. It is not.

¶ 43 Bosse argues admission of these exhibits placed undue emphasis on Stambaugh's testimony. However, he does not claim he was prejudiced by admission of these exhibits. He neither argues they might have confused or misled the jury, nor points to any other prejudice they might have caused him. Stambaugh used the figures on the charts as a visual aid to explain her testimony. Bosse does not show how this visual presentation of the numbers over-emphasized Stambaugh's testimony. The trial court did not abuse its discretion in admitting this evidence. Because there is no error, there is no plain error. This proposition is denied.

**Exceptions to Rule of Sequestration**

¶ 44 Bosse claims in Proposition VI that the trial court abused its discretion in allowing the victims' family members to remain in the courtroom over his objection, violating his rights to due process and a fair and impartial trial under the Fourteenth Amendment to the United States Constitution and Article II, Sections 7 and 20 of the Oklahoma Constitution. Katrina's mother, Rebecca Allen, and her stepmother, Ginger Griffin, testified for the State in both first and second stage. Over Bosse's objection, both women were allowed to remain in the courtroom throughout the trial. Bosse had invoked the rule of sequestration, which allows a party to order the exclusion of witnesses from the courtroom, so they cannot hear testimony of other witnesses. 12 O.S. 2011, § 2615. The State may ask that persons who are the victims of crime, or their representatives, parents or relatives, be exempted from this exclusion. 12 O.S.2011,

§ 2615(5). A decision to include or exempt witnesses from the rule of sequestration is within the trial court's discretion. 12 O.S. 2011, § 2615; *Edwards v. State*, 1982 OK CR 204, ¶ 12, 655 P.2d 1048, 1051–52. The rule is intended to guard against the possibility that a witness's testimony might be tainted or manipulated by hearing other witnesses. *McKay v. City of Tulsa*, 1988 OK CR 238, ¶¶ 5–6, 763 P.2d 703, 704; *Weeks v. State*, 1987 OK CR 251, ¶ 4, 745 P.2d 1194, 1195. Allen was completely exempted from the rule of sequestration, and Ginger Griffin was exempted after her testimony in first stage was concluded. Ginger was the State's first witness.

¶ 45 Later in the trial, jurors viewed the autopsy photographs on monitors. Both Rebecca Allen and Ginger Griffin were seated behind the monitors on which pictures were shown to the jurors, directly in some jurors' line of sight as they viewed the photographs. Bosse objected, arguing that the women were showing emotion as they themselves viewed the pictures, that jurors could see this, and that the mere fact that family members were visible as jurors viewed the photographs allowing jurors to form an emotional bond with the family—was unduly prejudicial. The trial court denied Bosse's request for a mistrial, made the next day, but ordered that family members should move out of the jury's line of sight when jurors watched the monitors. Bosse raises this in support of his claim that the witnesses never should have been in the courtroom, but he does not claim that the trial court erred in refusing to grant his request for a mistrial.[4]

¶ 46 Bosse argues, as he did at trial, that he might be prejudiced if jurors felt sympathy for the family members who sat in the courtroom throughout the trial. He does not claim that either witness altered her testimony based on the evidence that she heard from other witnesses. This, of course, is the evil the rule of sequestration is designed to remedy. Bosse's other allegations of prejudice are speculative and not supported by the record. The trial court did not abuse its discretion in excepting Allen and Ginger

4. Thus we do not address the State's assertion that Bosse waived this issue.

Griffin from the rule of sequestration. This proposition is denied.

### Admission of Gruesome Photographs

 ¶ 47 Bosse claims in Proposition VII that the trial court abused its discretion in admitting gruesome and inflammatory photographs in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution. Admission of photographs is within the trial court's discretion. *Mitchell v. State,* 2010 OK CR 14, ¶ 57, 235 P.3d 640, 655. Photographs of a victim may depict the scene of the crime, show the nature, extent and location of wounds, or corroborate the medical examiner's testimony. *Id.* Photographs should not be admitted if their effect is such that the danger of unfair prejudice substantially outweighs their probative value. *Livingston v. State,* 1995 OK CR 68, ¶ 20, 907 P.2d 1088, 1094. This Court has often said that gruesome crimes make for gruesome photographs. *Cole v. State,* 2007 OK CR 27, ¶ 29, 164 P.3d 1089, 1096. This alone will not make them inadmissible, as long as they are not so unnecessarily hideous or repulsive that jurors cannot view them impartially. *Hain v. State,* 1996 OK CR 26, ¶ 45, 919 P.2d 1130, 1143; *Livingston,* 1995 OK CR 68, ¶ 20, 907 P.2d at 1094.

¶ 48 The trial court admitted nine photographs of Katrina taken at the scene and two of her taken at the morgue; three photographs of Christian taken at the scene and one of him taken at the morgue; and two photographs of Chasity taken at the scene.[5] Before trial, Bosse objected to State's Exhibit 95 but not to State's Exhibit 65, both pictures of Chasity, arguing that State's Exhibit 95 was cumulative. The trial court denied that objection but required the State to choose between State's Exhibits 65 and 66. Bosse objected to admission of both photographs at trial. Bosse also moved, before trial began, to exclude several photographs, including some of those raised in this proposition as erroneously admitted, as cumulative

and overly prejudicial. That motion was sustained in part and denied in part, and Bosse vigorously objected to admission of the photographs at trial. The photographs were shown to jurors on monitors in the courtroom during the testimony of State witnesses.

 ¶ 49 The photographs of Katrina's and Christian's bodies at the scene are extremely disturbing. Both of these victims were dead before the fire began. Any effects the fire had on their bodies were not relevant to their fatal injuries, but those effects do reflect the consequences of Bosse's decision to leave the bodies and set the trailer on fire. While in several of the pictures the bodies are covered in charred material or rubble, none of the photographs show marked or extensive effects of the fire. The photographs are relevant to show the scene and corroborate the medical examiner's testimony. They are not so hideous or repulsive that jurors could not view them impartially. *Anderson v. State,* 1999 OK CR 44, ¶ 38–39, 992 P.2d 409, 421. Bosse also complains of morgue pictures of both these victims, taken after the bodies were cleaned, and before the autopsies were performed. Long cotton-tipped probes are inserted into the victims' stab wounds, showing the location, direction and trajectory of the wounds. Again, these photographs are disturbing. However, they show jurors Bosse's handiwork and corroborate the medical examiner's testimony. The trial court did not abuse its discretion in admitting these exhibits. *Cole,* 2007 OK CR 27, ¶ 28, 164 P.3d at 1096.

 ¶ 50 The two pictures of Chasity, by contrast, are, as we said of similar photographs in *Livingston,* "profoundly disturbing.... [and] particularly perturbing." *Livingston,* 1995 OK CR 68, ¶ 18, 907 P.2d at 1094. Chasity's body was badly burned. Parts of her limbs were charred to the bone and fire debris had melted onto her face. We recognize that the photographs were relevant. That does not end our inquiry. As in *Livingston,* these horrible pictures of this six-year-old child "provoke an immediate visceral reaction." *Id.* We cannot say jurors

---

5. Bosse did not object at trial to two further exhibits which included barely visible portions of Chasity's body covered with rubble, and does not

raise admission of those photographs as error on appeal.

were able to view these two pictures impartially, and find their probative value was substantially outweighed by the danger of unfair prejudice. The trial court abused its discretion in admitting these exhibits. However, this error does not require relief. Considering the entire record, we conclude that these prejudicial photographs did not contribute to the jury's verdict of guilt or determination of sentence. *Cole,* 2007 OK CR 27, ¶ 32, 164 P.3d at 1097; *Mann v. State,* 1988 OK CR 7, ¶ 13, 749 P.2d 1151, 1156. This proposition is denied.

### Admission of Pre–Mortem Photographs

¶ 51 In Proposition VIII Bosse argues that the admission of pre-mortem photographs of the victims injected passion, prejudice, and other arbitrary and irrelevant factors into his trial. He claims that the amended § 2403 of the Oklahoma Evidence Code is unconstitutional on its face and as applied to his trial. Ginger Griffin was the State's first witness. Over Bosse's objection, the State introduced, through her testimony, photographs of all three victims taken while each was alive. Bosse claims admission of this evidence was error. Oklahoma law allows admission of this type of evidence to show the general appearance and condition of the victim while alive. *Goode v. State,* 2010 OK CR 10, ¶ 56, 236 P.3d 671, 682; 12 O.S. 2011, § 2403. We have found § 2403 requires the trial court to balance a pre-mortem photograph's probative value against its prejudicial effect. *Glossip v. State,* 2007 OK CR 12, ¶¶ 77–78, 157 P.3d 143, 156–57; *Hogan v. State,* 2006 OK CR 19, ¶ 64, 139 P.3d 907, 931. We review a trial court's decision to admit this evidence for abuse of discretion. *Goode,* 2010 OK CR 10, ¶ 57, 236 P.3d at 682–83.

¶ 52 Bosse acknowledges the law but argues that § 2403 is unconstitutional on its face and as applied to him. He argues that admission of pre-mortem photographs violates due process, and that the balancing test is contrary to the plain language of § 2403. Bosse does not overcome the presumption that legislative acts are constitutional. *Glossip,* 2007 OK CR 12, ¶ 78, 157 P.3d at 156–57. We have previously rejected these claims,

specifically finding that the balancing test remains and applies to this clause after the statute was amended to permit this type of evidence. *Hogan,* 2006 OK CR 19, ¶¶ 62–64, 139 P.3d at 930–31; *Coddington v. State,* 2006 OK CR 34, ¶¶ 53–57, 142 P.3d 437, 452–53. Bosse also claims that the photograph had no relevance to any issue in the second stage of trial. We have rejected this claim as well. *Malone v. State,* 2007 OK CR 34, ¶¶ 85–86, 168 P.3d 185, 218–19. We decline to reconsider these decisions. This proposition is denied.

### Instruction on First Degree Murder

¶ 53 In Proposition V, Bosse claims he was deprived of a fair trial when jurors were not instructed that malice aforethought cannot be presumed from the mere act of killing, in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9, and 20 of the Oklahoma Constitution. The trial court gave jurors the uniform jury instruction on malice murder: "The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life. External circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act." OUJI–CR 2d 4-63. Bosse objected, and asked the trial court to add the sentence, "However, you may not presume or infer the existence of the requisite intent, i.e. 'malice aforethought' from the fact of the slaying alone." The trial court refused. Bosse claims this was error. The trial court must instruct jurors accurately on the applicable law. *Soriano v. State,* 2011 OK CR 9, ¶ 36, 248 P.3d 381, 396. We review a trial court's decisions to grant or deny instructions for abuse of discretion. *Cipriano v. State,* 2001 OK CR 25, ¶ 14, 32 P.3d 869, 873–74.

¶ 54 Bosse argues that the uniform jury instruction shifted the burden of proof to him. He argues that, once jurors decided he killed a victim, they "might" want him to disprove that the killing was done with malice aforethought. Bosse claims the instruction implicitly required him to prove he did

not act with malice aforethought. At heart, Bosse is complaining about Oklahoma's use of "malice aforethought" as opposed to "premeditated design". He suggests that, because malice requires no ill-will, because it may be formed instantly before commission of the act, and because it may be proved by external circumstances, the State no longer has the burden to prove the essential elements of the crime. He argues the possibility of confusion was exacerbated when the prosecutor argued to jurors that intent could be formed in an instant; although Bosse suggests the prosecutor really meant jurors could presume intent from the fact of the crime, that is not what the prosecutor said. We have previously rejected this claim. *Marquez–Burrola v. State*, 2007 OK CR 14, ¶ 27, 157 P.3d 749, 759. Bosse offers no new reason to reconsider our decision. This proposition is denied.

### Sentencing Stage Claims

### Admission of Victim Impact Evidence

 ¶ 55 Bosse claims in three subpropositions in Proposition IX that his death sentence must be vacated because the admission of improper opinion testimony during the presentation of victim impact evidence violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9, and 19 of the Oklahoma Constitution. We review a trial court's decision to allow victim impact evidence for an abuse of discretion. *Malone*, 2007 OK CR 34, ¶ 62, 168 P.3d at 211. Bosse first claims that victim impact evidence generally acts as a "super" aggravating circumstance that will be present in every case, and thus defeats the narrowing function required in capital cases. We have repeatedly rejected this argument. *See, e.g., Bush v. State*, 2012 OK CR 9, ¶ 62–64, 280 P.3d 337, 349–50; *Malone*, 2007 OK CR 34, ¶ 46, 168 P.3d at 204.

¶ 56 Next, Bosse claims that the three victim impact witnesses should not have been allowed to offer their opinions asking for a death sentence. Bosse objected to this evidence at trial, preserving the issue for re-

view. We have repeatedly rejected this claim as well. *See, e.g., Bush*, 2012 OK CR 9, ¶ 67, 280 P.3d at 350; *Malone*, 2007 OK CR 34, ¶ 47, 168 P.3d at 204–05. Bosse argues that the Tenth Circuit has routinely disagreed with this Court's reasoning on this issue, and asks this Court to reconsider its position. *See, e.g., DeRosa v. Workman*, 679 F.3d 1196, 1240 (10th Cir.2012). While always mindful of the respect due to other courts, the Tenth Circuit's interpretation of this issue is not binding on this Court. We decline the invitation to reconsider our consistent position on this issue.

 ¶ 57 Finally, Bosse argues that Ginger Griffin's testimony regarding her stepgrandchildren, Christian and Chasity, was improper. Victim impact statements may be given in homicide cases by surviving family members including a parent by birth or adoption, a grandparent, child or stepchild, stepbrother, stepsister or stepparent, 21 O.S. 2011, § 142A–1(1), (4).[6] Bosse argues that this list does not include stepgrandparents, and Ginger's testimony should not have been admitted. Bosse objected on these grounds at trial and has preserved the issue for review. The trial court did not abuse its discretion in permitting Ginger's testimony. As Katrina's stepparent, Ginger was a "victim" permitted to testify under § 142A–1(1). As a victim, she properly testified about the emotional and psychological effects the murders had on her, including information about the victims, circumstances surrounding the crimes, the manner in which the crimes were committed, and her recommendations for sentences on each count. 21 O.S.2011, § 142A–1(8). Bosse's reliance on *Goode v. State* is misplaced. In *Goode*, a person was allowed to testify as a family representative who did not fit into the "victim" categories of § 142A–1(1) or the "immediate family member" categories of § 142A–1(4). *Goode*, 2010 OK CR 10, ¶¶ 62–65, 236 P.3d at 683–84. We held that, under those circumstances, the family representative should not have testified about the effect of the deaths on her and her own daughter. *Goode*, 2010 OK CR 10,

---

6. Section 142A–1 was modified in 2014, but the relevant portions of the statute are not affected.

¶ 64, 236 P.3d at 683–84.[7] Here, by contrast, Ginger Griffin was herself a victim under § 142A–1(1). The trial court did not abuse its discretion in admitting this evidence. *Malone*, 2007 OK CR 34, ¶ 62, 168 P.3d at 211.

¶ 58 Bosse argues that the combined effect of improperly admitted victim impact testimony denied him a fair and reliable sentencing hearing. We have found that there was no error in admission of victim impact testimony. The trial court did not abuse its discretion in admitting the evidence, and this proposition is denied.

**Claims Regarding Aggravating Circumstances**

 ¶ 59 In Proposition XI Bosse claims that the evidence was insufficient to support the heinous, atrocious or cruel aggravating circumstance as to each victim, violating his rights under the Eighth and Fourteenth amendments to the United States Constitution and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution. "[T]he term 'heinous' means extremely wicked or shockingly evil; the term 'atrocious' means outrageously wicked and vile; and the term 'cruel' means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others." *Postelle v. State*, 2011 OK CR 30, ¶ 79, 267 P.3d 114, 143 (quotation omitted). The State had the burden to show beyond a reasonable doubt that Bosse inflicted either torture, including great physical anguish or extreme mental cruelty, or serious physical abuse on each victim; in cases of great physical anguish or serious physical abuse, the victim must have experienced conscious physical suffering before death. *Coddington v. State*, 2011 OK CR 17, ¶ 59, 254 P.3d 684, 708–09. The victim's awareness of the defendant's actions is crucial to this aggravating circumstance. *Underwood*, 2011 OK CR 12, ¶ 64, 252 P.3d at 247–48. We review the evidence in the light most favorable to the State, considering whether any rational trier of fact could find the aggravating circumstance be-

yond a reasonable doubt. *Coddington*, 2011 OK CR 17, ¶ 62, 254 P.3d at 710. The State alleged that each victim experienced conscious physical and mental suffering, and that the likelihood they saw the other victims attacked subjected them to extreme mental cruelty and anguish. Bosse's pretrial motion to strike this aggravating circumstance as to each victim was denied after a hearing. At trial, Bosse demurred to the evidence of this aggravating circumstance as to each victim. The demurrer was overruled.

 ¶ 60 Chasity had blunt force trauma to her head, which may or may not have rendered her unconscious. Her blood was found on Bosse's right shoe. She was put in the master bedroom closet, and the doorknob was blocked from the outside with a chair. She was in the closet when the trailer was set on fire. Evidence showed that depletion of oxygen would have incapacitated Chasity in sixteen to fifty minutes. Chasity's brain was swollen, her tissues showed she had been exposed to high levels of carbon monoxide, she had soot in her airways, esophagus and stomach, and her body was charred. Dr. Yacoub testified that the soot in Chasity's stomach indicated she tried to cough out the smoke and swallow it, and that Chasity could not have done this if she were unconscious. Chasity died of smoke inhalation and thermal injury—that is, she burned to death. Bosse argues there was no conclusive evidence that Chasity consciously suffered after she sustained the head wound and was put in the closet. We continue to decline to hold that proof of conscious suffering required for serious physical abuse must be conclusive and definitive. *Browning*, 2006 OK CR 8, ¶ 50, 134 P.3d at 842–43. Bosse relies on cases where the medical examiner testified the victim died within seconds, or the victim was unconscious, and possibly deaf and blind, at the scene. *Simpson v. State*, 2010 OK CR 6, ¶ 44, 230 P.3d 888, 903; *Turrentine v. State*, 1998 OK CR 33, ¶¶ 75–76, 965 P.2d 955, 977. In both these cases, unlike the present case, testimo-

---

7. Bosse also relies on *Lott v. State*, 2004 OK CR 27, 98 P.3d 318. In that 2004 case, the Court noted that a granddaughter was not among the persons included in § 142A–1. *Lott*, 2004 OK CR 27, ¶ 112 n. 15, 98 P.3d 318, 347 n. 15. *Lott* does not apply here, as Ginger Griffin is among the persons specifically authorized to give victim impact evidence under the statute.

ny showed the victim had no awareness and was not able to consciously suffer for any appreciable length of time. Here, by contrast, jurors could reasonably infer that Chasity was alive and conscious as she was hit in the head, locked in the closet, and the trailer was set on fire. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Chasity's murder was heinous, atrocious or cruel.

■ ¶ 61 Bosse also claims evidence was insufficient to show that Katrina and Christian's deaths were heinous, atrocious or cruel. Katrina had eight separate stab wounds. She bled into her airway and lungs. Death would have taken anywhere from minutes to hours, during which time her body diverted blood to her vital organs. Katrina also had incised wounds to her hand consistent with defensive wounds inflicted by grabbing or holding a knife blade. The stab wounds on her arms were also consistent with defensive wounds, inflicted while Katrina was conscious and trying to protect herself. Katrina was most likely conscious when these were inflicted. Katrina had also suffered blunt force trauma to the right side of her head. When Katrina's body was found, her legs were laying across Christian's legs. Christian had five stab wounds. Two of the injuries to his neck, and the wound to his chest, damaged major veins and caused significant bleeding. Like Katrina, Christian's body diverted blood to vital organs, which would have taken some time. The stab wound to Christian's arm was consistent with a defensive wound received when he was consciously trying to defend himself. He also had blunt force trauma to the head.

¶ 62 Other evidence supported an inference of a struggle. When Bosse was interviewed on July 23, he had several injuries, including abrasions on his right knuckles and a long scratch on his arm. There was a hole in the door to the master bedroom consistent with a fist punch. Evidence showed Christian was protective of Katrina; a pocketknife of Christian's, which was kept in Katrina's dresser, was found underneath Katrina's body. Evidence that a victim was conscious and aware of an attack supports a finding of torture and serious physical abuse, as does the presence of defensive wounds. *Black v. State*, 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074; *Alverson v. State*, 1999 OK CR 21, ¶ 51, 983 P.2d 498, 515. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that the deaths of Katrina and Christian were heinous, atrocious or cruel. *Easlick v. State*, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559. This proposition is denied.

■ ¶ 63 Bosse claims in Proposition XII that the evidence was insufficient to prove the "murder to avoid arrest" aggravating circumstance beyond a reasonable doubt in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution. Bosse's demurrer to this evidence was overruled at trial. The State had to show that Bosse committed a predicate crime, separate from the three murders, and that the killings were done to avoid arrest or prosecution for that predicate crime. *Coddington*, 2011 OK CR 17, ¶ 46, 254 P.3d at 705. The defendant must intend, not just to commit the predicate crime, but to eliminate a witness to that crime by killing the victim. *Smith v. State*, 2013 OK CR 14, ¶ 59, 306 P.3d 557, 576; *Lott*, 2004 OK CR 27, ¶ 117, 98 P.3d at 348. The defendant's intent, which may be proved by circumstantial evidence, is crucial to proof of this aggravating circumstance. *Coddington*, 2011 OK CR 17, ¶ 48, 254 P.3d at 706; *Lott*, 2004 OK CR 27, ¶ 116, 98 P.3d at 348.

¶ 64 The State alleged that the predicate crime was Bosse's theft of the Griffins' personal property. On July 22, 2010, Katrina discovered that fifteen video games were missing from the trailer. Katrina suspected that a friend, Henry Price, had stolen the games. Before calling the sheriff, Katrina persuaded Bosse to take her to her friend Heather Malloy's house in search of Price that night. When she could not find Malloy, Katrina called the sheriff's office to report the theft. Bosse was present at Katrina's trailer when Deputy Cunningham took Katrina's report. Price, contacted after the murders, denied stealing the video games. The day after the crime, Bosse had a PlayStation

game console, Wii, televisions, laptop computer, DVDs and video games from Katrina's trailer. At the time of his arrest on the evening of July 23, Bosse had pawned some of these items; others were in his truck or apartment. Bosse attempted to conceal his possession and disposal of all these items from law enforcement. In addition, mitigating evidence from Bosse's family included testimony that for several years Bosse had stolen money and property from close friends and family members. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Bosse committed all three murders to avoid arrest or prosecution. *Easlick*, 2004 OK CR 21, ¶ 15, 90 P.3d at 559. This proposition is denied.

¶ 65 In Proposition XIII, Bosse claims that the aggravating circumstances found by the jury failed to perform the narrowing function required by the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution. He argues that none of the aggravating circumstances, as presented to the jury through instructions, adequately serve the narrowing function necessary for constitutional application of the death penalty. We have repeatedly rejected these arguments. Specifically, we have found that the aggravating circumstance that the defendant created a great risk of death to more than one person is constitutional. *Wood v. State*, 2007 OK CR 17, ¶ 26, 158 P.3d 467, 477. We have found the aggravating circumstance that the murder was committed to avoid arrest or prosecution is sufficiently narrow as to be constitutional. *Hanson v. State*, 2009 OK CR 13, ¶ 48, 206 P.3d 1020, 1034. We have found the aggravating circumstance that the murder was heinous, atrocious or cruel is narrow enough to be constitutional. *Smith*, 2013 OK CR 14, ¶ 61, 306 P.3d at 577; *Postelle*, 2011 OK CR 30, ¶ 84, 267 P.3d at 144. As the State notes, Bosse admits this but argues that the narrowing limitations for each circumstance are insufficient because, he alleges, they have been inconsistently applied. We have rejected this argument, stating, "an aggravating circumstance does not become 'overbroad' based upon the manner it is applied to partic-

ular cases." *Mitchell v. State*, 2006 OK CR 20, ¶ 104, 136 P.3d 671, 711 (quoting *DeRosa v. State*, 2004 OK CR 19, ¶ 91, 89 P.3d 1124, 1155).

¶ 66 In this proposition Bosse also complains about two instructions. He notes that there is no uniform jury instruction for the aggravating circumstance that the defendant created a great risk of death to more than one person. Bosse neither objected to the absence of such an instruction, nor requested such an instruction, and has waived all but plain error. *Postelle*, 2011 OK CR 30, ¶ 86, 267 P.3d at 144–45. We have held that no separate uniform instruction defining this aggravating circumstance is necessary, finding that use of the statutory language explaining this aggravating circumstance sufficiently informs jurors what is necessary to support a finding that it is present. *Eizember v. State*, 2007 OK CR 29, ¶¶ 137–139, 164 P.3d 208, 241. Bosse also complains the uniform instruction on the aggravating circumstance that the murders were heinous, atrocious or cruel fails to narrow the sentencer's discretion. Bosse objected to this instruction, and his request for a different instruction on this circumstance was denied by the trial court. As Bosse admits, this Court has rejected this claim. *Postelle*, 2011 OK CR 30, ¶ 84, 267 P.3d at 144. This proposition is denied.

## Claims Common to Both Stages of Trial

### Medical Examiner's Testimony

¶ 67 In Proposition III, Bosse argues that the entirety of the medical examiner's testimony was inadmissible, because the medical examiner's office is not accredited and is therefore unable to provide testimony pursuant to state law. He claims that, without the medical examiner's testimony, there was insufficient evidence to establish a cause of death. In addition, the medical examiner's testimony was used to establish the aggravating circumstance that the murders were heinous, atrocious or cruel.

¶ 68 Dr. Inas Yacoub, a board-certified forensic pathologist with the Medical Examiner's office, performed the autopsies

on all three victims and testified for the State at trial. Dr. Yacoub described in detail the physical condition of all three victims, stated their causes of death, and concluded that each death was a homicide. Dr. Yacoub testified that, due to building and equipment deficiencies and high case loads, the Medical Examiner's office has not been accredited since 2009. Bosse claims that, because the Medical Examiner's office lacks accreditation, Dr. Yacoub's testimony was inadmissible. Admission of evidence is within the trial court's discretion. *Neloms,* 2012 OK CR 7, ¶ 25, 274 P.3d at 167. An abuse of discretion is any unreasonable or arbitrary action made without proper consideration of the relevant facts and law, also described as a clearly erroneous conclusion and judgment, clearly against the logic and effect of the facts. *Neloms,* 2012 OK CR 7, ¶ 35, 274 P.3d at 170. Bosse did not raise this claim at trial, or object to Dr. Yacoub's testimony on these grounds and has waived all but plain error. Plain error is an actual error, that is plain or obvious, and that affects a defendant's substantial rights, affecting the outcome of the trial. *Barnard v. State,* 2012 OK CR 15, ¶ 13, 290 P.3d 759, 764.

¶ 69 The Forensic Laboratory Accreditation Act (Act) was passed in 2002. 74 O.S. 2011, §§ 150.36, 150.37. It provides that, as of July 1, 2005, all forensic laboratories defined in the Act and already operating by that date shall be accredited—formally recognized by an accrediting body as meeting or exceeding applicable quality standards. 74 O.S.2011, §§ 150.37(A)(2), (B). The Act further provides that "testimony, results, reports, or evidence of forensics analysis produced on behalf of the prosecution in a criminal trial shall be done by an accredited forensic laboratory." 74 O.S.2011, § 150.37(C). An accredited forensic laboratory is one "operated by the state or any unit of municipal, county, city or other local government that examines physical evidence in criminal matters and provides opinion testimony in a court of law." 74 O.S.2011, § 150.37(A)(5). The Act specifically excepts several types of testimony, results, reports, or evidence: (a) breath testing for alcohol; (b) "field testing, crime scene processing, crime scene evidence collection, searches,

examinations or enhancements of digital evidence, and crime scene reconstruction"; (c) latent print examination performed by an IAI certified latent print examiner; and (d) evidence of marijuana identification using generally accepted methods which have been approved by a properly accredited forensic laboratory. 74 O.S.2011, § 150.37(C)(3), (4), (5), (6). Bosse argues that the Medical Examiner's office conducts examinations equivalent to forensic analysis, produces results, prepares reports and provides testimony on behalf of the prosecution in criminal trials. He argues that the Medical Examiner's office is not within any exceptions to the accreditation rule. Because the Medical Examiner's office is not accredited, Bosse claims, Dr. Yacoub's testimony was inadmissible.

¶ 70 The State argues that the Medical Examiner's office is not subject to the accreditation requirement of the Act. The State notes that other specific definitions included in the Act refer to accrediting bodies concerned with laboratories, laboratory operations, testing of biological samples, maintenance, analysis and testing of forensic evidence, and testing and calibration laboratories. 74 O.S.2011, § 150.37(A)(2), (3), (4), (6), (8). The State emphasizes the Act's references to ISO/IEC 17025 standards. These are defined as the International Organization of Standards/International Electrotechnical Commission standard 17025, published by the Organization for Standardization and the International Electrotechnical Commission, specific to the maintenance and testing of forensic evidence. 74 O.S. 2011, § 150.37(A)(3), (4). These references certainly indicate that the Act is intended to apply to all laboratories which maintain equipment and conduct toxicological, forensic and similar types of analysis commonly done in a laboratory setting, and which may be reviewed using ISO/IEC 17025 standards. The question is whether this language is exclusive. Dr. Yacoub testified that the Medical Examiner's office accrediting body is the National Association of Medical Examiners. The parties ask this Court to decide whether the type of physical examination and analysis of bodies, per-

formed by the Medical Examiner's office, and which could be accredited by a nationally recognized accrediting entity, is also within the scope of the Act.[8] The State argues that, because Bosse failed to object on these grounds at trial, there is not a sufficient record concerning the application of the ISO/IEC 17025 standards to forensic pathologists. Such a record is not necessary for this Court's resolution of this claim.

¶ 71 Forensic pathologists with the Medical Examiner's office investigate deaths by physically examining bodies, performing autopsies, and issuing written reports with an opinion on the cause and manner of death. *Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶ 34, 241 P.3d 214, 228. The Medical Examiner should reasonably expect autopsy reports to be used in a criminal prosecution. *Id.* Dr. Yacoub testified that she examined the bodies, and sent blood samples from the victims to the toxicology laboratory for analysis, because the laboratory tests constituted an additional tool she could use to reach her conclusions. The State argues that these duties do not constitute "laboratory work" as contemplated by the Act.

¶ 72 We find that whether the Medical Examiner's office is subject to the accreditation provisions of the Act does not determine whether testimony such as Dr. Yacoub's is admissible. The duties and responsibilities of the Medical Examiner's office, and of its forensic pathologists, are set forth separately in Title 63. The Medical Examiner is required to investigate the cause and manner of violent deaths. 63 O.S.2011, §§ 938, 941. This includes a physical examination of the body of the deceased, collection of physical specimens from the body, review of medical records, evidence, photographs of the scene of death, and objects or writings near the body. 63 O.S.2011, §§ 941, 944. For every

investigation, investigators and the Medical Examiner must prepare written reports, including an autopsy report, which must be furnished to investigating agencies. 63 O.S. 2011, §§ 942, 945. The Medical Examiner is specifically required to keep a full record of the investigation, including any autopsy report, and to submit records to the appropriate district attorney, and may be required to testify regarding the records or report. 63 O.S.2011, § 949. While Title 63 contains no requirement that the Medical Examiner's office itself must be accredited, each individual medical examiner appointed by the Medical Examiner must be board certified to practice forensic pathology in Oklahoma. 63 O.S. 2011, § 937.

¶ 73 When interpreting statutory provisions, our paramount concern is to give effect to the Legislature's intention. *Leftwich v. State*, 2015 OK CR 5, ¶ 15, 350 P.3d 149, 155; *State v. Iven*, 2014 OK CR 8, ¶ 13, 335 P.3d 264, 268. We consider the plain and ordinary language of a statute, other statutes involving the same or similar subjects, and "the natural or absurd consequences of any particular interpretation." *Iven*, 2014 OK CR 8, ¶ 13, 335 P.3d at 268. We try to reconcile the language of general statutes with more specific statutory provisions, to give effect to each. *Leftwich*, 2015 OK CR 5, ¶ 15, 350 P.3d at 155. Specific statutory language controls over general language. *State v. Crowley*, 2009 OK CR 22, ¶ 4, 215 P.3d 99, 100. As the State notes, the Legislature recently amended several sections of Title 63 concerning the Medical Examiner's office. 2014 Okla. Sess. Laws 293. The record before us does not indicate the Legislature was aware, at the time, that the Medical Examiner's office has been unaccredited since 2009. However, it has been established that the Legislature was actually aware of

8. The State repeatedly veers into irrelevant territory. First the State recites at length Dr. Yacoub's qualifications, which were not contested and are not at issue. Her qualifications can have no effect on whether the Medical Examiner's office is subject to § 150.37. The State also spends a great deal of time discussing the qualifications, conclusions, and discussion surrounding the testimony of Dr. Curtis, the State's toxicologist. The fact that the Medical Examiner's office uses a separate, accredited laboratory to perform toxicology tests may be probative of the claim that the Medical Examiner's office is not itself subject to the Act. However, specific evidence regarding Dr. Curtis, the tests and results in this case, and the internal practices of the toxicology laboratory are not relevant to the issue before this Court.

this fact,[9] and yet amended the statutes relating to the duties of that office without reference to any effect that lack of accreditation may have on its duties. From this, we conclude that the Legislature intended the Medical Examiner's office to function as is set forth in and required by the provisions of Title 63, independently of any accreditation issues. We conclude that, as long as the requirements of Title 63 are met in each case, accreditation of the Medical Examiner's office goes to the weight of the evidence, not its admissibility. If, as here, jurors are presented with evidence that the Medical Examiner's office was unaccredited at the time of the autopsies, jurors may give that information whatever weight they feel appropriate.

¶ 74 Dr. Yacoub's testimony was properly admitted. Furthermore, although this is not required for admissibility, jurors were made aware, through testimony, of the accreditation issues, and could consider them in weighing Dr. Yacoub's evidence. The trial court did not abuse its discretion in admitting this evidence. Because there was no error, there was no plain error. This proposition is denied.

**Prosecutorial Misconduct**

¶ 75 In Proposition X, Bosse claims that the prosecution engaged in deliberate misconduct during both stages of trial, depriving him of his rights to a fair trial and reliable sentencing hearing in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article II, sections 7, 9 and 20 of the Oklahoma Constitution. Both parties have wide latitude in closing argument to argue the evidence and reasonable inferences from it. *Coddington*, 2011 OK CR 17, ¶ 72, 254 P.3d at 712. We will not grant relief for improper argument unless, viewed in the context of the whole trial, the statements rendered the trial fundamentally unfair, so that the jury's verdicts are unreliable. *Miller v. State*, 2013 OK CR 11, ¶ 116, 313 P.3d 934, 974. We review a trial court's decisions concerning argument for abuse of discretion. *Underwood v. State*, 2011 OK CR 12, ¶ 75, 252 P.3d 221, 250. Bosse objected to some statements; we re-

9. *Leftwich*, 2015 OK CR 5, ¶ 4, 350 P.3d at 152.

view the others for plain error. *Id.* at ¶ 122, 313 P.3d at 976. Plain error is an actual error, that is plain or obvious, and that affects a defendant's substantial rights, affecting the outcome of the trial. *Barnard*, 2012 OK CR 15, ¶ 13, 290 P.3d at 764.

¶ 76 Bosse complains of three separate errors in first stage closing argument. First, he argues the prosecutor improperly commented on his lack of remorse for the crimes. Detective Huff testified that, during his interview, Bosse had an unusual reaction when asked if he was sad about the victims' deaths. The trial court overruled Bosse's objection but noted that the topic was close to an improper discussion of remorse, and the prosecutor moved on to another line of questioning. In closing, the prosecutor argued that Bosse's initial reaction—a long, calm silence—was not normal. The prosecutor later asked what Bosse could have meant by his eventual reply, "I'm more in awe." In second closing, the prosecutor argued that there was "some kind of emotional connection" missing from this statement, and one would expect, if Bosse had not committed the crime, that he would be "a little bit upset" by the deaths. Bosse did not object to these comments and has waived all but plain error as to them. These are not comments on Bosse's lack of remorse. Rather, they are reasonable inferences from the evidence of Bosse's reaction to news of the victims' deaths.

¶ 77 Bosse next complains that the prosecutor impermissibly defined reasonable doubt by arguing that it was not "beyond all doubt". Bosse did not object to this statement and we review for plain error. There is none. We have held that it is not error to use this phrase in discussing reasonable doubt. *Myers v. State*, 2006 OK CR 12, ¶ 57, 133 P.3d 312, 329.

¶ 78 Bosse argues that the prosecutor shifted the burden of proof to the defense. Discussing Bosse's alibi, the prosecutor argued that, even taking into account the testimony of Detective Huff and Bosse's mother, Bosse had shown nothing other than

his own statements to prove his whereabouts during the time the crime could have been committed. In closing, defense counsel had argued that Lord's experiments were contrived and conducted in such a way as to fit the State's timeline. The prosecutor argued in reply that defense counsel had not shown that law enforcement and Lord ever agreed to "fix" the timeline to fit Bosse's guilt, but that Bosse wanted jurors to infer this in order to help manufacture his defense. Bosse's objections to these comments were overruled. These statements were not error. Where the defense has not offered evidence on an issue, the prosecutor may argue that the evidence is uncontroverted. *Myers*, 2006 OK CR 12, ¶ 61, 133 P.3d at 329; *Fite v. State*, 1993 OK CR 58, ¶ 21, 873 P.2d 293, 297. Neither of these comments shifted the burden of proof to Bosse. Bosse claims the prosecutor erred in commenting that he could have independently tested the DNA evidence. Bosse's objection was overruled. This comment was not error, as the State may note that a defendant had access to, and did not test, evidence. *Myers*, 2006 OK CR 12, ¶ 61, 133 P.3d at 329. The prosecutor then noted the State had the burden of proof, but argued that the defense should not argue about test results when Bosse had the chance to test the evidence himself. Bosse's objection was sustained and the jury was admonished, but his request for a mistrial was denied. Given that the prosecutor prefaced the comment by stating the correct burden of proof, no mistrial was necessary, and the trial court's action cured any error. *Johnson v. State*, 2013 OK CR 12, ¶ 16, 308 P.3d 1053, 1057.

¶ 79 Bosse argues the prosecutors made four improper arguments during second stage closing argument. He first claims that the prosecutor improperly commented on his courtroom demeanor. In support of the charge that Bosse would present a continuing threat to society, the prosecutor argued that one indicator of continuing threat was a lack of remorse, and noted that Bosse did not flinch when the photographs of the victims were displayed. Bosse's objection was sustained and jurors admonished to disregard any comment on Bosse's demeanor. This cured any error. *Johnson*, 2013 OK CR

12, ¶ 16, 308 P.3d at 1057. The record does not support Bosse's argument otherwise, particularly as jurors did not find that Bosse would present a continuing threat to society.

¶ 80 Bosse next complains that the prosecutor expressed a personal opinion regarding the appropriate sentence. The prosecutor first argued that Bosse had earned the death penalty. The trial court overruled Bosse's objection, but admonished the prosecutor to confine her argument to her recollection of the evidence. The prosecutor rephrased her comment to say that the evidence showed Bosse had earned the death penalty, and discussed that evidence. While initially poorly phrased, the record shows that this comment was not a personal opinion. Later in closing, the State argued that the person who could commit these crimes against, particularly, children, deserved the ultimate punishment. Bosse's objection to personal opinion was overruled. The record shows this was not an expression of personal opinion, but based on the evidence presented. During second closing, the State argued that the death penalty was reserved for the worst of the worst, who was sitting in front of the jury. Bosse's objection was overruled. The State argued Bosse should not get the benefit of slaughtering three people at one time. Although Bosse's objection was sustained, the trial court refused his request to admonish the jury. Finally, the prosecutor argued he believed death was the verdict best reflecting justice for Bosse's actions. Remarks about the appropriateness of the death penalty are not error where, rather than being phrased personally, they appeal to juror's understanding of justice. *Hogan*, 2006 OK CR 19, ¶ 90, 139 P.3d at 935–36. It is not error to argue that justice requires imposition of the death penalty under the facts and law of a particular case. *Id*. A request to impose the death penalty, or an argument that the death penalty is proper in a particular case, or that a defendant deserves a death sentence, are not necessarily, without more, expressions of personal opinion. *Pavatt v. State*, 2007 OK CR 19, ¶ 63, 159 P.3d 272, 291.

¶ 81 Bosse claims that prosecutors improperly encouraged jurors to sympathize with the victims. The prosecutor described what the victims might have been thinking and feeling as the crimes were committed. The record shows the prosecutor was gesturing and becoming emotional during the speech. The trial court overruled Bosse's objection. During second closing, the prosecutor described the attack in detail, without explicitly asking jurors to imagine themselves in that situation. The record shows that during this argument the prosecutor lay on the floor "hollering, gesturing wildly with his arms in a way that mimics someone making a knife attack." Bosse's objection was overruled. This claim actually presents two issues—the appropriateness of the argument itself and the prosecutor's actions in making the argument. We have held a prosecutor may ask jurors to put themselves in a victim's place while describing the victim's experience, as long as the argument is based on the evidence. *Browning v. State,* 2006 OK CR 8, ¶ 37, 134 P.3d 816, 839; *Malicoat v. State,* 2000 OK CR 1, ¶ 31, 992 P.2d 383, 401; *Hooper v. State,* 1997 OK CR 64, ¶¶ 52–53, 947 P.2d 1090, 1110. The argument here was not improper. Turning to the second issue, we have distinguished emotional, physical argument which is directed specifically at the defendant (and thus improper) from theatrics which are properly directed to the jury, and which illustrate otherwise-proper argument. *Underwood,* 2011 OK CR 12, ¶ 75, 252 P.3d at 250. This is the case here. The trial court did not abuse its discretion in overruling Bosse's objections to this argument. *Id.*

¶ 82 Bosse claims the State argued that life without parole did not amount to punishment. The record does not support this claim. The prosecutor urged jurors not to let Bosse manipulate them into recommending a sentence less than death. Bosse did not object. The argument was based on evidence that Bosse's family and friends said he was manipulative, and was not error. The prosecutor argued that life without parole amounted to "no extra consequences", and that the way in which the victims were killed deserved extra consequences. As we discuss above, Bosse's objection was sustained when the prosecutor argued that Bosse should not get the benefit of slaughtering three people at once, but his request to admonish the jury was overruled. Bosse did not object when the prosecutor repeated the statement, argued Bosse should not get the same punishment for three as he would for one, and asked twice for extra consequences. Bosse relies on an Illinois case in which the prosecutor argued that, based on Illinois law, the defendant would automatically receive life without parole for two victims, so anything less than death would give the defendant five free murders. The Illinois Supreme Court found this was inflammatory, inaccurate as a statement of law, and not supported by the evidence. *People v. Kuntu,* 196 Ill.2d 105, 256 Ill.Dec. 500, 752 N.E.2d 380, 403 (2001). This case is distinguishable. Bosse's jurors were not faced with automatic imposition of any penalty, and had taken an oath to consider all three punishment options available in Oklahoma. The State's argument was neither a misstatement of law nor of the facts. The prosecutor's request for extra consequences was based on the evidence. The trial court did not abuse its discretion in overruling Bosse's objections. *Underwood,* 2011 OK CR 12, ¶ 75, 252 P.3d at 250.

¶ 83 No prosecutorial misconduct prejudiced Bosse, and this proposition is denied.

### Ineffective Assistance of Counsel

¶ 84 Bosse claims in Proposition XIV that trial counsel were ineffective in violation of the Sixth Amendment to the United States Constitution and Article II, § 20 of the Oklahoma Constitution. Bosse claims trial counsel was ineffective for failing to object to Dr. Yacoub's testimony, and for failure to object to improper comments in the State's closing argument. Bosse must show that counsel's performance was deficient, and that the deficient performance was prejudicial. *Miller,* 2013 OK CR 11, ¶ 145, 313 P.3d at 982; *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel's acts or omissions must have been so serious that Bosse was deprived of a fair trial with reliable results. *Harrington v.*

*Richter*, 562 U.S. 86, 104, 131 S.Ct. 770, 787–88, 178 L.Ed.2d 624 (2011). Trial counsel's performance is measured by an objective standard of reasonableness under prevailing professional norms. *Coddington*, 2011 OK CR 17, ¶ 78, 254 P.3d at 713–14; *Rompilla v. Beard*, 545 U.S. 374, 380, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005). Bosse must demonstrate a reasonable probability that, absent counsel's deficient performance, the outcome of the trial would have been different and the jury would have concluded the balance of aggravating circumstances and mitigating evidence did not support the death penalty. *Coddington*, 2011 OK CR 17, ¶ 78, 254 P.3d at 713–14; *Miller*, 2013 OK CR 11, ¶ 145, 313 P.3d at 982; A reasonable probability is one sufficient to undermine confidence in the outcome. *Fisher v. State*, 2009 OK CR 12, ¶ 7, 206 P.3d 607, 609. We give great deference to counsel's decisions, considering them according to counsel's perspective at the time. *Rompilla*, 545 U.S. at 380–81, 125 S.Ct. at 2462; *Wiggins*, 539 U.S. at 523, 123 S.Ct. at 2536. We presume counsel's conduct is professional, and his actions may be considered the product of a reasonable trial strategy. *Coddington*, 2011 OK CR 17, ¶ 78, 254 P.3d at 713–14. Bosse must show he was prejudiced by counsel's acts or omissions. *Williams v. Taylor*, 529 U.S. 362, 394, 120 S.Ct. 1495, 1513–14, 146 L.Ed.2d 389 (2000); *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067. Where a defendant fails to show prejudice, we will dispose of a claim of ineffective assistance on that ground. *Marshall v. State*, 2010 OK CR 8, ¶ 61, 232 P.3d 467, 481.

 ¶ 85 Bosse can show no prejudice from counsel's omissions. We found in Proposition II that whether the Medical Examiner's office is accredited goes to the weight of the testimony rather than its admissibility. As Dr. Yacoub's testimony was admissible, Bosse was not prejudiced from trial counsel's failure to object to its admissibility on grounds of lack of accreditation. In Proposition X, we found that none of the State's comments in closing argument, to which trial counsel did not object, were error. Trial counsel cannot be ineffective for failing to object to these comments. As there is no prejudice from counsel's omissions, we will

not find counsel ineffective. This proposition is denied.

## Accumulation of Error

 ¶ 86 In Proposition XV, Bosse claims the accumulation of errors deprived him of a fair trial and sentencing. He argues that individual trial errors, taken together, require relief. We found only one error in the preceding propositions. We determined in Proposition VII that two photographs of Chasity's burned body should not have been admitted. However, we found admission of those photographs was harmless beyond a reasonable doubt. Where a single error has been addressed, there is no cumulative error. *Bell v. State*, 2007 OK CR 43, ¶ 14, 172 P.3d 622, 627. Bosse's trial was fairly conducted. *Brumfield v. State*, 2007 OK CR 10, ¶ 37, 155 P.3d 826, 840. This proposition is denied.

## Mandatory Sentence Review

 ¶ 87 We must determine (a) whether Bosse's sentences of death were imposed under the influence of passion, prejudice or any other arbitrary factor, and (b) whether the evidence supports the trial court's findings of the aggravating circumstances. 21 O.S.2011, § 701.13(C). In Propositions XI and XII we found the evidence was sufficient to support the aggravating circumstances that the murders were heinous, atrocious or cruel, and that they were committed in order to avoid arrest and prosecution for another crime. The evidence also established that Bosse's actions created a great risk of death to more than one person. We find the evidence supports the trial court's findings that the aggravating circumstances were present.

 ¶ 88 In determining whether the sentences of death were imposed under the influence of passion, prejudice or any other arbitrary factor, we do not independently reweigh the evidence supporting the aggravating circumstances against that presented in mitigation. This Court "does not act as an independent factfinder or substitute our judgment for that of the trier of fact." *Malone v. State*, 2013 OK CR 1, ¶ 79, 293 P.3d 198, 219. Rather, we review the evidence "only to the extent necessary to determine

whether there was sufficient evidence from which a rational sentencer could find that the balance of aggravating and mitigating circumstances warranted a death sentence." *Malone*, 2013 OK CR 1, ¶ 82, 293 P.3d at 220 (*quoting Fisher v. State*, 1987 OK CR 85, ¶ 25, 736 P.2d 1003, 1011).

¶ 89 In mitigation, Bosse presented evidence that he had no significant criminal history and his prior crimes were non-violent; that his ability to appreciate the criminality of his conduct was greatly impaired by drugs and alcohol; that he used drugs since his senior year in high school and regularly used pills and methamphetamine; that because his father abandoned him and did not maintain a close relationship, he was deprived of the opportunity to have a proper male role model; that Bosse's father neglected him and his brother; that in childhood he suffered head injuries that may have negatively contributed to his mental health; that his brother bullied and teased him; that his family, friends and cellmates described him as generous and helpful; that he was thirty years old at the time of trial; that he would benefit from the structure of prison life; that family members said Bosse was helpful, cooperative and a contribution to their lives; that his friends and family were shocked by the crime, because they believed it was out of character with his shy, quiet, nonaggressive personality, and that Bosse did not lose his temper; that he physically assisted his mother and grandparents with chores; that he gladly helped friends and family when requested; that his friends and family maintained relationships with Bosse while he was incarcerated; that his employers described him as a hard worker and self-starter who got along with co-workers; that his mother and grandmother maintained a close relationship with him in jail through daily telephone conversations and weekly visitation; that he had a good relationship with his nephew, playing with him and attending sporting events; that his father's alternative bisexual lifestyle was detrimental to Bosse's upbringing; that his mother struggled to provide for her children; that his mother suffered from depression and struggled to maintain a clean and proper home during his childhood; and

that his family and friends loved him and wished for him to live.

¶ 90 After thoroughly reviewing the entire trial proceedings, we find the death penalty was not imposed under the influence of passion, prejudice or any other arbitrary factor. 21 O.S.2011, § 701.13(C). No improperly admitted evidence or argument affected the jury's determination of sentence. The sentences of death are factually substantiated and appropriate. 21 O.S.2011, § 701.13(F).

## DECISION

¶ 91 The Judgments and Sentences of the District Court of McClain County are **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2015), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, V.P.J. and HUDSON, J.: concurring in part/dissenting in part.

JOHNSON and LEWIS, JJ.: specially concurring.

LUMPKIN, V.P.J., Concurring in Part/Dissenting in Part.

¶ 1 I concur in affirming Appellant's convictions and sentences, however, I cannot acquiesce in the analysis of Proposition Two. As a State court of last resort, we must independently construe Federal Constitutional issues based on existing precedent from the United States Supreme Court and not speculate on what that Court may do or not do in the future.

¶ 2 Appellant neither invoked his Fifth Amendment right to silence nor fully invoked his Fourth Amendment right to refuse consent to search in the present case. Instead, he voluntarily spoke with the officers, indicated that he would fully cooperate with the investigation, refused to permit the officers to conduct a full search of his truck but did agree to a limited search as well as the photographing of the contents of the vehicle. The investigators photographed several items which were marked with Katrina Griffin's initials. When the officers searched Appellant's truck pursuant to a search warrant

a few hours later, most of the items were gone. At trial, the State introduced Appellant's voluntary statement indicating that he would cooperate with the investigators, the photographs of the truck's contents, his refusal to consent to a full search of the truck, and the results of the later search. In closing argument, the prosecutor argued that Appellant's refusal to consent to the search pointed to his guilt.

¶ 3 Appellant, now, challenges both the State's admission of the evidence concerning his refusal to consent to a full search of his vehicle and the prosecutor's comments concerning that evidence in closing argument. Because Appellant failed to timely challenge the prosecutor's comments at trial, this Court reviews his claim for plain error under the test set forth in *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690. *Malone v. State*, 2013 OK CR 1, ¶ 40, 293 P.3d 198, 211; *Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923.[1]

¶ 4 Neither the United States Supreme Court nor this Court has previously determined whether evidence of a criminal defendant's refusal to consent to a search is constitutionally prohibited. Strict application of Fifth Amendment precedent results in the conclusion that the evidence was admissible.

¶ 5 The United States Supreme Court distinguishes silence which occurs following the receipt of warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), from silence prior to receipt of such warnings. In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court determined that due process prohibited prosecutors from using a criminal suspect's silence, at the time of arrest and after receiving his *Miranda* warnings, for impeachment purposes at trial. *Id.*, 426 U.S. at 619, 96 S.Ct. at 2245. This result was compelled by the *Miranda* decision. *Id.*, 426 U.S. at 617, 96 S.Ct. at 2244. In *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65

L.Ed.2d 86 (1980), the Supreme Court determined that this rule did not apply to a suspect's pre-arrest silence prior to receipt of *Miranda* warning's implicit promise that any silence will not be used against him. *Id.*, 447 U.S. at 240, 100 S.Ct. at 2130.

¶ 6 The prosecution may use evidence of a suspect's statement to the police as well as pre-arrest silence. *Hogan v. State*, 1994 OK CR 41, ¶ 20, 877 P.2d 1157, 1161. "Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630. In *Salinas v. Texas*, — U.S. ——, 133 S.Ct. 2174, 186 L.Ed.2d 376 (2013), the Supreme Court determined that the prosecution's use of a criminal suspect's noncustodial silence did not violate the Fifth Amendment because the suspect had not expressly invoked the privilege against self-incrimination. *Id.*, 133 S.Ct. at 2178–79 (plurality opinion). In *Salinas*, the suspect had voluntarily gone to the police station and answered the police officer's questions but balked and fell silent when the officer asked whether his shotgun would match the shells recovered at the murder scene. *Id.*, 133 S.Ct. at 2177–78. The Supreme Court determined that the suspect's silence did not constitute the invocation of the Fifth Amendment privilege. *Id.*, 133 S.Ct. at 2178–79.

¶ 7 In the present case, Appellant was not in custody but voluntarily traveled to the Sheriff's office and answered the investigator's questions. He did not receive a *Miranda* warning and never expressly invoked his privilege against self-incrimination. Therefore, the prosecution's use of Appellant's statements to the investigators did not violate the Fifth Amendment.

¶ 8 Recognizing this fact, Appellant seeks to have this Court apply the reasoning from *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), to the circumstances of his case. He asserts that the

---

1. Under the test for plain error set forth in *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, an appellant must show an actual error, that is plain or obvious, affecting his substantial rights, and which seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice.

*Id.*, 1994 OK CR 40, ¶ 10, 26, 30, 876 P.2d at 694, 699, 701; *Levering v. State*, 2013 OK CR 19, ¶ 6, 315 P.3d 392, 395; *Malone v. State*, 2013 OK CR 1, ¶ 41, 293 P.3d 198, 211–212. "[P]lain error is subject to harmless error analysis." *Id.*, 1994 OK CR 40, ¶ 20, 876 P.2d at 698.

prosecution's use of his refusal to consent to a full search of his truck was identical to the "penalty" that the Supreme Court identified in *Griffin.* (Brf. 24–25).

¶ 9 Appellant cites the Tenth Circuit Court of Appeals' decision in *United States v. Dozal,* 173 F.3d 787 (10th Cir.1999), as persuasive on this point. I agree. In *Dozal,* the Tenth Circuit concluded that "asking a jury to draw adverse inferences from" the failure to consent to a search "may be impermissible if the testimony is not admitted as a fair response to a claim by the defendant or for some other proper purpose." *Id.,* 173 F.3d at 794 (*citing United States v. McNatt,* 931 F.2d 251, 258 (4th Cir.1991)).

¶ 10 *Dozal* is consistent with the United States Supreme Court's interpretation as to what constitutes a penalty for the exercise of a constitutional right. It is without question, that an individual may not be criminally prosecuted for the mere refusal to consent to a warrantless search. *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991); *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 540, 87 S.Ct. 1727, 1736–37, 18 L.Ed.2d 930 (1967). However, evidence of the assertion of a constitutional right does not constitute a penalty in all instances. In *Griffin,* the United States Supreme Court recognized that the Fifth Amendment prohibits comment by the prosecution on the accused's refusal to testify or jury instructions by the court that such silence is evidence of guilt. *Id.,* 380 U.S. at 615, 85 S.Ct. at 1233. The Supreme Court reasoned:

> For comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' *Murphy v. Waterfront Comm.,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 [(1964)], which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly. It is said, however, that the inference of guilt for failure to testify as to facts peculiarly within the accused's knowledge is in any event natural and irresistible, and that comment on the failure does not magnify that inference into a penalty for asserting

a constitutional privilege. *People v. Modesto,* 62 Cal.2d 436, 452–453, 42 Cal.Rptr. 417, 426–427, 398 P.2d 753, 762–763 [(1965)]. What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another.

*Id.,* 380 U.S. at 614–15, 85 S.Ct. at 1232–33. In *United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), the Supreme Court refused to expand *Griffin* to include a prosecutor's fair response to argument of the defendant, but, instead, explicitly limited *Griffin* to precluding prosecutorial comments which treat the defendant's silence as substantive evidence of guilt. *Id.,* 485 U.S. at 32, 34, 108 S.Ct. at 869–70 ("There may be some "cost" to the defendant in having remained silent in each situation...."). Therefore, prosecutorial comments concerning a criminal defendant's refusal to consent to a search which solemnize the refusal into substantive evidence of guilt are prohibited but evidence concerning the refusal itself may be permissible if the testimony is admitted as a fair response to a claim by the defendant or for some other proper purpose.

¶ 11 Applying this analysis to the present case results in the conclusion that the trial court did not abuse its discretion when it admitted the officers' testimony about Appellant's refusal to consent to a full search of his vehicle. *Neloms v. State,* 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170. Because Appellant's refusal to consent to a full search of his truck was central to the chain of events and helped explain the officers' subsequent actions, the challenged evidence was properly admissible. *See Stouffer v. State,* 2006 OK CR 46, ¶ 76, 147 P.3d 245, 265 (finding evidence introduced to show basis for further police action admissible); *Warner v. State,* 2006 OK CR 40, ¶ 68, 144 P.3d 838, 868 (holding evidence central to the chain of events admissible). The challenged evidence helped explain why the officers took photographs of the items but were unable to seize the initialed items from Appellant's truck. As such, the evidence as to Appellant's limited waiver was properly admissible.

¶ 12 The challenged evidence was also admissible to refute the notion that Appellant had fully cooperated with the investigators. Because Appellant's refusal to consent to a full search of his truck was inconsistent with the spirit of cooperation he attempted to portray in the interview, the District Court did not abuse its discretion in admitting the challenged evidence.

¶ 13 Turning to the State's closing argument; some of the prosecutor's comments crossed the line. No error, plain or otherwise, occurred when the prosecutor merely referenced the evidence in closing argument. *Williams v. State,* 2008 OK CR 19, ¶ 107, 188 P.3d 208, 228 (finding no error where prosecutor's comments were based upon the evidence). However, the prosecutor's comments which solemnized Appellant's refusal to consent to a full search of his truck into substantive evidence of guilt constituted error. In light of the absence of any controlling precedent on this issue, the error was not plain or obvious in the absence of an objection. *Malone,* 2013 OK CR 1, ¶ 42, 293 P.3d at 212; *Simpson,* 1994 OK CR 40, ¶¶ 26, 876 P.2d at 699. Therefore, Appellant has not shown that he is entitled to relief.

¶ 14 Furthermore, the prosecutor's comments were harmless beyond a reasonable doubt. *Simpson,* 1994 OK CR 40, ¶ 34, 876 P.2d at 701, *citing Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The evidence of Appellant's guilt was strong. The numerous items belonging to Katrina Griffin which Appellant pawned coupled with the discovery of the victims' blood on his shoes and clothing overwhelmingly connected him to the murders. No relief is required as to Proposition Two.

¶ 15 I further write to address the status of the law as to a victim impact witness' opinion as to the appropriate punishment in a capital sentencing proceeding. In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the United States Supreme Court held that the Eighth Amendment prohibited introduction of victim impact evidence in the sentencing phase of a capital case. *Id.,* 482 U.S. at 509, 107 S.Ct. at 2536. The Supreme Court determined that a victim impact statement which both described the

personal characteristics of the victims and the emotional impact of the crimes on the family and set forth the family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence was *per se* inadmissible. *Id.,* 482 U.S. at 502–03, 107 S.Ct. at 2533. Two years later, in *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), the Supreme Court extended the rule announced in *Booth* to statements made by a prosecutor to the sentencing jury regarding the personal qualities of the victim. *Gathers,* 490 U.S. at 811–12, 109 S.Ct. at 2211; *Payne,* 501 U.S. at 826, 111 S.Ct. at 2609. However, the notion that the Eighth Amendment prohibited victim impact evidence was short lived.

¶ 16. In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court reconsidered its decisions in *Booth* and *Gathers* and held that "the Eighth Amendment erects no *per se* bar" to the "admission of victim impact evidence and prosecutorial argument on that subject." *Id.,* 501 U.S. at 827, 111 S.Ct. at 2609. One year after *Payne,* the Oklahoma Legislature specifically provided for the admission of victim impact evidence in sentencing considerations. *Neill v. State,* 1994 OK CR 69, ¶ 50, 896 P.2d 537, 553, citing 22 O.S.Supp.1992, §§ 984, 984.1, and 991a(C). In *Neill,* this Court determined that victim impact evidence was properly admissible during the sentencing stage of trial pursuant to *Payne* and these statutory provisions. *Id.,* 1994 OK CR 69, ¶¶ 50–52, 896 P.2d at 553–54. Since *Neill,* we have maintained that victim impact evidence is admissible so long as it is not so unduly prejudicial that it renders the trial fundamentally unfair. *Bush v. State,* 2012 OK CR 9, ¶¶ 62–65, 280 P.3d 337, 349–50; *Goode v. State,* 2010 OK CR 10, ¶ 62, 236 P.3d 671, 683; *Williams v. State,* 2001 OK CR 9, ¶ 58, 22 P.3d 702, 718; *Conover v. State,* 1997 OK CR 6, ¶ 59, 933 P.2d 904, 920.

¶ 17 However, a single footnote within *Payne* has caused some confusion. In footnote number 2, Chief Justice Rehnquist stated:

Our holding today is limited to the holdings of *Booth v. Maryland,* 482 U.S. 496,

107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing. *Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. No evidence of the latter sort was presented at the trial in this case. *Payne,* 501 U.S. at 830 n. 2, 111 S.Ct. at 2611 n. 2. Based upon this language, the United States Court of Appeals for the Tenth Circuit has taken the position that *Payne* did not overrule all of *Booth* and thus "it remains constitutionally improper for the family members of a victim to provide 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital case." *DeRosa v. Workman,* 679 F.3d 1196, 1237 (10th Cir.2012). As shown in our discussion of Proposition Two, above, we are ever respectful of the Tenth Circuit's interpretation of constitutional issues, but have chosen not to follow the Tenth Circuit's interpretation as to this issue.

¶ 18 In *Ledbetter v. State,* 1997 OK CR 5, 933 P.2d 880, this Court found that it was clear that *Payne* had overruled all of *Booth. Id.,* 1997 OK CR 5, ¶ 27, 933 P.2d at 890–91. Because the rationale supporting the ban on characterizations and opinions about the crime, the defendant, and the appropriate sentence had its roots in the overruled Eighth Amendment rationale, we determined that this portion of *Booth* was also overruled. *Id.; Conover,* 1997 OK CR 6, ¶ 60, 933 P.2d at 920 ("*Payne* also implicitly overruled that portion of *Booth* regarding characterizations of the defendant and opinions of the sentence.").

¶ 19 I further note that the footnote in *Payne* does not have any precedential value. On more than one occasion, the Supreme Court has rejected language from footnotes as dictum. *United States v. Dixon,* 509 U.S. 688, 706, 113 S.Ct. 2849, 2861, 125 L.Ed.2d 556 (1993) (recognizing footnote as "the pur-

est dictum"); *Wainwright v. Witt,* 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985) (explaining "footnotes are in any event dicta."); *McDaniel v. Sanchez,* 452 U.S. 130, 141, 101 S.Ct. 2224, 2231, 68 L.Ed.2d 724 (1981) (holding footnote was not controlling as it was dictum); *Henderson v. Morgan,* 426 U.S. 637, 651, 96 S.Ct. 2253, 2261, 49 L.Ed.2d 108 (1976) ("[N]ew rules of constitutional law are not established in dicta in footnotes."). Instead, the actual holding of the opinion is the controlling language. *See Kerry v. Din,* — U.S. ——, 135 S.Ct. 2128, 2138, 192 L.Ed.2d 183, (2015) (rejecting footnoted dictum in favor of the actual holding of the case). In *Payne,* the United States Supreme Court explicitly overruled both *Booth* and *Gathers* stating "they were wrongly decided and should be, and now are, overruled." *Payne,* 501 U.S. at 829, 111 S.Ct. at 2611. Merely stating in a footnote that *Payne* did not involve victim opinion as to appropriate punishment cannot revive any part of the two previous opinions that *Payne* unequivocally overruled as "wrongly decided." *Id.*

¶ 20 I do not know how the United States Supreme Court could be clearer. The judges of this Court can only apply the law as it is and cannot make decisions based on speculation of what the law might be in the future.

¶ 21 This Court has long recognized that "*Payne* and not *Booth,* is the controlling case on this issue." *Conover,* 1997 OK CR 6, ¶ 60, 933 P.2d at 920. We have continued to approve of the use of characterizations and opinions about the crime, the defendant, and the appropriate sentence as evidence in capital sentencing proceedings. *Bush,* 2012 OK CR 9, ¶ 63, 280 P.3d at 349; *Jackson v. State,* 2007 OK CR 24, ¶ 25, 163 P.3d 596, 603; *Murphy v. State,* 2002 OK CR 24, ¶ 45, 47 P.3d 876, 885. We are waiting for the issue to be presented to the United States Supreme Court. *Murphy,* 2002 OK CR 24, ¶ 45, 47 P.3d at 885. Until the United States Supreme Court issues a definitive opinion on the issue, we will continue to apply the explicit language of *Payne* and approve of such evidence in other capital cases. *Id.*

JOHNSON, Judge, Specially Concurring.

¶ 1 I agree with the decision to affirm this case. I write to clarify one point regarding

the introduction at trial of evidence relating to the Medical Examiner's office's lack of accreditation.

¶ 2 The issue addressed by this Court in this case is whether Dr. Yacoub's testimony was inadmissible because the Medical Examiner's office is not accredited. I agree that the admissibility of evidence such as Dr. Yacoub's testimony is not determined by whether the Medical Examiner's office is subject to the accreditation provisions of The Forensic Laboratory Accreditation Act. The court's conclusion that "as long as the requirements of Title 63 are met in each case, accreditation of the Medical Examiner's office goes to the weight of the evidence, not its admissibility" is also correct. It is worth mentioning, however, that the admissibility of this evidence must always be prefaced upon a threshold finding of relevancy. This Court's ruling does not in any way suggest or support the assumption that evidence regarding accreditation of the Medical Examiner's office will always be relevant.

LEWIS, J., Specially Concurs.

¶ 1 I write separately to emphasize my views on the improper use of a defendant's exercise of a constitutional right. The opinion undertakes a thorough analysis and finds persuasive authority indicating that improper comment on the exercise of a constitutional right is error. The Opinion, however, instead of making a strong stand on the impropriety of such comment, creates an "assuming arguendo" scenario which emphasizes the lack of prejudice in this case.

¶ 2 Evidence that a defendant has properly exercised a right to refuse consent to a warrantless search should in no way be used as a negative inference against that defendant.[1] The prosecution used Bosse's exercise of his Fourth Amendment right to refuse consent to a full search as evidence of guilt. If there

is any doubt about the prosecution's intended use of Bosse's refusal, one must look no further than the closing argument, where the prosecution argued that his only motivation in not allowing officers to thoroughly search his vehicle without a warrant was his guilt. The error is unequivocally clear in this case, and the Opinion should be equally unequivocal in its conclusion.

¶ 3 Fortunately for the prosecution, the constitutional error committed in this case is harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Bosse allowed officers to photograph the contents of his vehicle, and then he disposed of the contents before the officers obtained a warrant.[2] This admissible evidence revolving around the search, and other evidence of Bosse's guilt, was overwhelming. Future cases, however, may not have such overwhelming evidence, and violations of these principles could jeopardize future convictions.

HUDSON, Judge, Concur in Part/Dissent in Part.

¶ 1 I concur in affirming Bosse's convictions and sentences. However, I write to express my concerns with the majority's approach to Bosse's second proposition. The majority opinion provides an in-depth analysis of whether a defendant's Fourth Amendment right to refuse consent to search is admissible and therefore may be used as substantive evidence of guilt. The majority's extended discussion of this issue suggests that it may not. Yet, the majority ultimately does not resolve this issue,[1] instead assuming arguendo error but finding its admission harmless. Herein lies my concern. While I find the admission of Bosse's limited consent to search was not error under the circumstances presented here, of greater concern is my fear that the majority's decision will be

1. The cases supporting this holding are thoroughly cited in the Opinion and will not be repeated here.

2. Although Bosse's actions were admissible and indicate guilt, a defendant should not be subject to an adverse inference based solely on the ineptitude of law enforcement, and their failure to preserve evidence by proper means not in con-

flict with the Fourth Amendment warrant requirement.

1. "For purposes of this case, we assume *without deciding* that a defendant's exercise of his Fourth Amendment right to refuse consent to search may not be used as substantive evidence of guilt." (emphasis added).

misconstrued as creating a definitive bright-line rule precluding the admission of such evidence regardless of the circumstances.

¶ 2 Bosse voluntarily spoke to the police. During this pre-custody interaction, the investigators asked Bosse if they could search his car. The majority characterizes Bosse's response to this request as a flat refusal. In actuality, while Bosse initially refused the investigator's request, Bosse voluntarily revisited his decision and consented, limiting or restricting the scope of his consent to photographing the contents of his truck. Bosse's subsequent consent is analogous to the situation in which an accused invokes his right to counsel yet later reinitiates further communication with the police. *See Pickens v. State,* 1993 OK CR 15, ¶ 12, 850 P.2d 328, 333 ("An accused who has been advised of his *Miranda* rights and invokes his right to have counsel present during custodial interrogation is not subject to further interrogation by the authorities until counsel has been made available to the accused, unless the accused himself initiates further communication, exchange or conversations with the police."). Moreover, the investigators respected the constraints Bosse placed on his consent and did not exceed the reasonable scope of that consent. *See Randolph v. State,* 2010 OK CR 2, ¶ 19, 231 P.3d 672, 679 ("[w]hen the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent.") (citing W. LaFave, 3 Search and Seizure: A Treatise on the Fourth Amendment, § 8.1(c), 610 (3d ed., West 1996)) (quoting *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).

¶ 3 The challenged evidence, both Bosse's initial refusal and subsequent consent, were relevant and pivotal pieces of the puzzle, which the jury needed to fully understand the sequence of events surrounding law enforcement's investigation of the murders. The reality is we live in a world in which the public hyper-scrutinizes the actions of law enforcement. Had the trial court precluded this evidence, the jury likely would have questioned why law enforcement merely took pictures of the contents of Bosse's truck instead of actually seizing the evidence. Hence, when viewed in the appropriate light, admission of the evidence relating to the circumstances of Bosse's voluntary consent, albeit restricted, was appropriate under the circumstances of this case, and the District Court did not abuse its discretion by admitting such evidence. *See Neloms v. State,* 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170 (an abuse of discretion is "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented" (quoting *Stouffer v. State,* 2006 OK CR 46, ¶ 60, 147 P.3d 245, 263)).

¶ 4 Where error likely occurred though is in the State's use of this evidence as substantive evidence of Bosse's guilt. As to the resolution of this specific issue, I concur with the majority's finding that any such error was harmless. However, I note again my concern with the lengthy and ultimately unnecessary analysis the majority utilized to reach this determination. Although the issue presented here is one of first impression, the majority does not decide the issue and the majority's extended discussion amounts to dicta.[2] It is important to remain cognizant that this Court is not bound by dicta. *See Kerry v. Din,* —— U.S. ——, 135 S.Ct. 2128, 2134, 192 L.Ed.2d 183 (2015) (Court is not bound by dicta); *see also Yost v. Stout,* 607 F.3d 1239, 1244 n. 6 (10th Cir.2010). In light of the limited number of cases this Court publishes each year, I am fearful this case will be incorrectly touted as creating a definitive "hard-and-fast" rule precluding in all cases the admission of evidence concerning a defendant's refusal to search.

---

**2.** "A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) *are based upon the facts of the case,* and (3) lead to the judgment. If not a holding, a proposition stated in a case counts as dicta." *Yost v. Stout,* 607 F.3d 1239, 1244 n. 6 (10th Cir.2010) (quoting Michael Abramowicz & Maxwell Stearns, *Defining Dicta,* 57 Stan. L.Rev. 953, 1065 (2005)) (emphasis added by court).